**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DAVID JOHNSON,

        *Petitioner-Appellant,*

        v.

J.D. WHITEHEAD, Warden; CALVIN
MCCORMICK, Field Office Director;
JAMES T. HAYES, JR., Director;
JULIE MYERS, Assistant Secretary
of Homeland Security; MICHAEL
CHERTOFF, Secretary of Homeland
Security; MICHAEL B. MUKASEY,
U.S. Attorney General,

        *Respondents-Appellees.*

No. 09-1981

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, Senior District Judge.
(8:08-cv-01872-PJM)

DAVID LIVINGSTON JOHNSON, a/k/a
Conrad Llewellyn,

        *Petitioner,*

        v.

ERIC H. HOLDER, JR., Attorney
General,

        *Respondent.*

No. 10-1488

On Petition for Review of an Order of
the Board of Immigration Appeals.

Argued: January 25, 2011

Decided: May 24, 2011

Before TRAXLER, Chief Judge, and WILKINSON and GREGORY, Circuit Judges.

---

No. 09-1981 affirmed; No. 10-1488 petition denied by published opinion. Judge Wilkinson wrote the majority opinion, in which Chief Judge Traxler joined. Judge Gregory wrote a dissenting opinion.

---

**COUNSEL**

**ARGUED:** Angad Singh, WASHINGTON COLLEGE OF LAW, Appellate Advocacy Clinic, Washington, D.C., for Petitioner/Appellant. Eric Warren Marsteller, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents/Appellees. **ON BRIEF:** Ali A. Beydoun, UNROW HUMAN RIGHTS IMPACT LITIGATION CLINIC, Washington, D.C., for Petitioner/Appellant. Tony West, Assistant Attorney General, Civil Division, Ada E. Bosque, Senior Litigation Counsel, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents/Appellees.

---

**OPINION**

WILKINSON, Circuit Judge:

In 2008, the Department of Homeland Security ("DHS") initiated removal proceedings against David Johnson, alleging that he was an alien who had committed a variety of gun and

drug offenses. Both the immigration judge and the Board of Immigration Appeals ("BIA") agreed with DHS that Johnson was removable. Johnson then filed a petition for a writ of habeas corpus and a petition for review. He claims that he is a citizen under 8 U.S.C. § 1432(a)(3). As explained below, that claim falters under the plain meaning of this constitutionally valid act of Congress.

Johnson also argues that because he was declared a United States citizen in a 1998 removal proceeding, DHS is precluded from litigating the issue of his alienage in later removal proceedings. But this claim runs into multiple problems. The immigration judge in the 1998 proceedings never purported to declare Johnson a United States citizen. Immigration judges do not even have the authority to confer citizenship. *See Barnes v. Holder*, 625 F.3d 801, 805-06 (4th Cir. 2010). Yet notwithstanding his criminal misconduct since the 1998 proceedings, he seeks to have DHS forever precluded from seeking his removal.

This too has problems. Johnson disregards the general rule that agencies are "free to fashion their own rules of procedure" without interference from courts. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council, Inc.*, 435 U.S. 519, 544 (1978). He asks us to impose a sweeping rule of preclusion that would prospectively immunize criminal aliens from deportation, no matter what crimes they might at some future date commit. But that course would breach the established relationship between courts and agencies and contravene Congress's efforts to secure the orderly removal of criminal aliens. *See* 8 U.S.C. §§ 1228, 1252; *Duvall v. Attorney General of the United States*, 436 F.3d 382, 391 (3d Cir. 2006). As a result we affirm the district court's dismissal of Johnson's petition for a writ of habeas corpus and deny his petition for review.

I.

David Johnson, a native of Jamaica, entered the United States as a lawful permanent resident on October 1, 1972 at

the age of seven. Johnson's father accompanied him. Although his father became a naturalized citizen a little over a year after their arrival, his father failed to use the procedure Congress created to apply for United States citizenship on his minor son's behalf. Johnson also never applied for United States citizenship on his own behalf prior to 1996.

Johnson committed a number of crimes during his time in this country. On January 27, 1989, he was convicted of carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). And on May 1, 1989, he was convicted in state court of unlawful possession of a controlled substance and aggravated assault.

The Immigration and Naturalization Service ("INS"), whose powers in this area have since been transferred to DHS, sought to deport Johnson on the basis of these convictions. On August 21, 1992, INS issued Johnson an Order to Show Cause, claiming Johnson was deportable from the United States based on his criminal offenses. The immigration judge terminated the proceedings for reasons that were not discussed in the order.

On June 21, 1996, INS issued another Order to Show Cause, claiming Johnson was deportable on account of his drug and firearms convictions. The immigration judge terminated the proceedings on February 9, 1998, stating that Johnson "appears to be [a] U.S. citizen by [his] father's [naturalization]." J.A. 31. INS did not appeal.

On December 16, 1996, during the pendency of the removal proceedings, Johnson filed a Form N-600 Application for Certificate of Citizenship with INS, claiming that he derived United States citizenship from his father's naturalization. Johnson relied on 8 U.S.C. § 1432(a)(3), which has since been repealed. This subsection stated that "[t]he naturalization of the parent having legal custody of the child when there has been a legal separation of the parents" conferred citizenship

on that child. 8 U.S.C. § 1432(a)(3). On April 5, 2000, INS denied the application because Johnson, whose parents had never married, could not show that his parents had legally separated. Johnson did not appeal INS's denial.

On January 28, 2002, Johnson was convicted of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and was sentenced to 108 months imprisonment. Near the end of that term, on June 18, 2008, DHS initiated removal proceedings against Johnson and served him with a Notice to Appear, alleging that he was an alien removable by virtue of his 2002 and 1989 convictions. Johnson argued that preclusion principles barred DHS from relitigating the issue of his citizenship because the immigration judge in the 1998 proceedings had found him to be a United States citizen.

On May 21, 2009, the immigration judge denied Johnson's motion to terminate the proceedings and ordered him deported. The immigration judge concluded that DHS was not precluded from litigating the issue of Johnson's citizenship because the 1998 termination order did not make any citizenship finding. Even if this obstacle were absent, the immigration judge reasoned, under *Duvall v. Attorney General of the United States*, 436 F.3d 382 (3d Cir. 2006), Johnson's commission of an additional crime since the 1998 proceedings lifted any preclusion bar that might otherwise have existed. Additionally, the immigration judge ruled that Johnson did not derive citizenship from his father's naturalization.

Johnson appealed this decision to the BIA. The BIA dismissed the appeal, relying principally on the *Duvall* argument and agreeing that Johnson did not obtain citizenship through his father's naturalization. Johnson filed a petition for review.

Johnson also petitioned for a writ of habeas corpus on July 18, 2008, raising the same citizenship issue he litigated in the removal proceedings. The district court dismissed the petition. Johnson appealed, but this court held the case in abeyance

pending the BIA's decision in Johnson's removal proceedings. On May 12, 2010, upon Johnson's filing of a petition for review of the BIA's dismissal of his appeal, this court consolidated Johnson's habeas appeal with his petition for review.

II.

We first consider Johnson's petition for a writ of habeas corpus. At oral argument Johnson conceded that his petition for review, not his habeas corpus petition, was the proper avenue of appeal. This is because the district court was without jurisdiction to consider the citizenship issues raised in the habeas petition.

Petitions for review are the appropriate vehicle for judicial review of legal and factual questions arising in removal proceedings. *See* 8 U.S.C. § 1252(a)(5) ("[A] petition for review . . . shall be the sole and exclusive means for judicial review of an order of removal . . . ."); 8 U.S.C. § 1252(b)(9) ("Judicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.").

In fact, Congress has specifically prohibited the use of habeas corpus petitions as a way of obtaining review of questions arising in removal proceedings. 8 U.S.C. § 1252(b)(9) ("[N]o court shall have jurisdiction, by habeas corpus . . . to review such an order or such questions of law or fact."). Therefore, because the issue of Johnson's citizenship arose in his removal proceedings, his petition for review, not his habeas corpus petition, is the proper means of seeking redress.

Johnson's habeas corpus petition is likewise barred because he failed to exhaust administrative remedies before filing his habeas action in the district court. *See* 8 U.S.C. § 1503(a) (requiring a "final administrative denial" before instituting a

suit "for a judgment declaring him to be a national of the United States"). Indeed, Johnson failed to appeal the rejection of his Form N-600 Application for Certificate of Citizenship to the Administrative Appeals Unit of INS.

Because 8 U.S.C. §§ 1252(b)(9) and 1503(a) prohibit Johnson from obtaining review of his citizenship claims through a habeas corpus petition, we affirm the district court's jurisdictional dismissal of Johnson's petition for a writ of habeas corpus. As directed by statute, we review Johnson's claims only in the context of his petition for review.

### III.

Johnson argues in his petition for review that he is a United States citizen and that the BIA adopted an impermissible and unconstitutional interpretation of 8 U.S.C. § 1432 in ruling otherwise. This issue is of central importance, because if Johnson ever was a citizen, his criminal acts would not strip him of citizenship and DHS would be unable to remove him. *See Minasyan v. Gonzales*, 401 F.3d 1069, 1075 (9th Cir. 2005). But the BIA in fact read the statute in accordance with its unambiguous meaning, and the statute passes constitutional muster.

### A.

The particular provision at issue here is 8 U.S.C. § 1432(a)(3):

> A child born outside of the United States of alien parents . . . becomes a citizen of the United States upon fulfillment of the following conditions: . . . (3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child was born out of wedlock and the paternity

of the child has not been established by legitimation
. . . .

Johnson argues that he qualifies for citizenship because his father had sole custody of him when his father became a United States citizen. Johnson claims to satisfy the "legal separation" requirement of § 1432(a)(3) because even though his parents were never married, his mother severed family ties before his father naturalized.

But Johnson's conclusion falters on the fact that his parents did not marry. The BIA has reasoned that the term "legal separation" requires that there first be a marriage and then formal steps to end that marriage. And that is the clear meaning of the statute.

Every circuit that has considered the issue has found a marriage requirement in the term "legal separation." *See Lewis v. Gonzales*, 481 F.3d 125, 130 (2d Cir. 2007); *Morgan v. Attorney General of the United States*, 432 F.3d 226, 234 (3d Cir. 2005); *Barthelemy v. Ashcroft*, 329 F.3d 1062, 1065 (9th Cir. 2003); *Nehme v. INS*, 252 F.3d 415, 425-26 (5th Cir. 2001). The Fourth Circuit is no exception. In *Afeta v. Gonzales*, 467 F.3d 402 (4th Cir. 2006), we held that the BIA's interpretation of "legal separation" as "requiring that the minor alien's parents have taken formal judicial steps to end their marriage" was a reasonable one. *Id.* at 404.

The reason for this unanimity lies in the strength of the underlying arguments for a marriage requirement. Section 1432(a)(3) is divided into two parts. The first concerns the circumstance of "legal separation." The second deals with "out of wedlock" situations. Over and above the fact that the term "legal separation" alone implies that there be some formal relationship, such as marriage, that can be ended only with legal action, the statute contrasts "legal separation" with "out of wedlock." Congress plainly did not break this subsection into two parts based on these two distinct terms with the

intention of making them functionally equivalent. Rather, § 1432(a)(3) created one path to citizenship for children whose parents had married but had undergone a "legal separation" and another for those children born "out of wedlock" whose parents had never married. Johnson could not seek citizenship under the former route because his parents never married. He has not sought to establish citizenship through the latter route because his mother never naturalized.

The marriage requirement also makes sense in light of the broader statutory scheme. Section 1432 takes pains to protect the rights of both parents. Naturalization is a "significant legal event with consequences for the child here and perhaps within his country of birth or other citizenship." *Lewis*, 481 F.3d at 131. Congress "recognize[d] that either parent . . . may have reasons to oppose the naturalization of their child, and it respects each parent's rights in this regard." *Id.* at 131; *see Wedderburn v. INS*, 215 F.3d 795, 800 (7th Cir. 2000) (explaining that a "parent may have reasons to prefer the child's original citizenship, which may affect obligations such as military service and taxation").

Accordingly, an automatic conferral of citizenship usually requires the naturalization of both parents, and exceptions to this rule, including § 1432(a)(3), are narrowly tailored to avoid undue interference in the parent-child relationship. 8 U.S.C. § 1432. The statutory exceptions cover some scenarios where one parent "has been removed from the picture" to some degree. *Wedderburn*, 215 F.3d at 800. These include situations where one parent is deceased, where the father has not legitimated his child and the mother has been naturalized, and where the parents have undergone a legal separation and one parent is awarded sole custody of the child. U.S.C. § 1432. None of these exceptions applied to Johnson. These are not arbitrary distinctions. At the very least, they all involve situations where it is reasonable to raise the rights of one parent above those of the other.

It is also important to keep in mind that § 1432 concerns only the automatic conferral of citizenship. Johnson did not "slip[ ] through some crack in our immigration law." *Lewis*, 481 F.3d at 132. Johnson's father could have applied to naturalize his son under the then-existing version of 8 U.S.C. § 1433, which allowed a citizen parent to apply for naturalization of his or her child. There was no legal separation requirement in that version of § 1433. But Johnson's father never pursued this avenue. Whatever the reason for Johnson's father's decision, the point is that immigration law provided children such as Johnson with an alternative route to citizenship.

## B.

Johnson's constitutional challenge is similarly flawed. Legal classifications based on legitimacy are typically reviewed under intermediate scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). But the immigration context is a special one.

The Supreme Court has emphasized Congress's plenary power over immigration and naturalization: "'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)). "[T]he power over aliens is of a political character and therefore subject only to narrow judicial review." *Id.* (quoting *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976)) (internal quotation marks omitted). Accordingly, in matters of immigration and naturalization, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Id.* (quoting *Mathews v. Diaz*, 426 U.S. 67, 80 (1976)) (internal quotation marks omitted).

Based on these principles, the *Fiallo* Court applied rational basis review to a legal classification based on legitimacy. *Id.* at 788-89, 794-95. Indeed, the issue in that case was similar

to the one here. In *Fiallo*, immigration statutes granted preferential immigration status to legitimate children of a United States citizen or lawful permanent resident. *Id.* at 788-89. But out of wedlock children could obtain the same preference only through their mother and not through their father. *Id.* at 788-89.

The statute at issue here, 8 U.S.C. 1432(a)(3), makes precisely the same distinction, automatically conferring citizenship on legitimate children when the parent with sole custody after a legal separation naturalizes and on out of wedlock children only when the mother naturalizes. Thus we must apply the same standard as the *Fiallo* court and uphold the statute if a "facially legitimate and bona fide reason" supports the distinction. *Id.* at 794 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972)) (internal quotation marks omitted). Our sister circuits have been faithful to *Fiallo* as well, applying rational basis review to 8 U.S.C. 1432(a)(3). *See Barthelemy*, 329 F.3d at 1065-66; *Wedderburn*, 215 F.3d at 800.

Congress certainly had a rational basis here. As discussed above, the distinction between children born in and out of wedlock protects parental rights. Section 1432 "limits automatic changes to situations in which the other parent has been removed from the picture." *Wedderburn*, 215 F.3d at 800. This removal can occur via death, a combination of legal separation and sole custody, or a father's failure to legitimate his child. 8 U.S.C. § 1432. Perhaps these three categories do not cover every conceivable situation in which the rights of a one parent should be elevated above those of the other. But our role is not to second-guess the judgment of Congress. Rather, the question is whether the statute is supported by a rational basis. And it surely is.[1]

(Text continued on page 13)

---

[1] A word in response to our fine colleague in dissent. Every circuit, including this one, to have considered the matter has found in the term "legal separation" a requirement of some formal legal step to end a marriage. The dissent's construction of § 1432(a)(3), however, strips the

"legal separation" language from the statute and replaces it with a more informal standard it calls "parental abandonment." Dissenting Opinion at 22-24. This is a novel reading of the statute, one that no court or agency has adopted. It is not clear what exactly is sufficient to meet the new "parental abandonment" standard, and neither Congress nor the relevant agencies nor the courts nor the dissent has set forth what the criteria should be. It is easy to speculate on all sorts of scenarios that may or may not amount to abandonment, and in any event we have no authority to write into the statute a standard Congress did not put there.

The dissent also calls for heightened scrutiny of § 1432(a)(3). The Supreme Court, however, has never disavowed the rational basis test adopted in *Fiallo* for precisely this situation, and the circuits upholding § 1432(a)(3) have likewise followed *Fiallo* in applying rational basis review. Recognizing the plenary power of Congress in the immigration context, the two cases upon which the dissent rests its case both *rejected* constitutional challenges to the statutes at issue. *See Nguyen v. INS.*, 533 U.S. 53, 72-73 (2001) (noting the "wide deference afforded to Congress in the exercise of its immigration and naturalization power"); *Miller v. Albright*, 523 U.S. 420, 434 n.11 (1998) ("Deference to the political branches dictates 'a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.'") (quoting *Mathews v. Diaz*, 426 U.S. 67, 82 (1976)).

The Court applied heightened scrutiny *only* because the statutes at issue could so clearly be upheld under that standard, thus eliminating the need to choose between heightened scrutiny and rational basis review. *See Nguyen*, 533 U.S. at 61 ("Given that determination [that the statute satisfies heightened scrutiny], we need not decide whether some lesser degree of scrutiny pertains . . . ."); *Miller*, 523 U.S. at 434 n.11 (opinion of Stevens, J., joined by Rehnquist, C.J.)("Even if . . . heightened scrutiny . . . applied in this context, we are persuaded that the requirement imposed by § 1409(a)(4) . . . is substantially related to important governmental objectives.") (internal citations omitted). Thus, neither *Nguyen* nor *Miller* held that heightened scrutiny is required.

Finally, our friend in dissent attempts to build an equitable case for petitioner, but it bears remarking that petitioner's difficulties are attributable to his repeated criminal offenses, not to any unconstitutional flaw in the immigration laws. And, to sum up, the combination of adopting a "parental abandonment" standard and requiring heightened scrutiny of § 1432(a)(3) requires the courts to formulate to an unacceptable extent immigration policy for Congress and DHS. We would be holding in effect

IV.

Johnson additionally argues that because DHS failed to prove his alienage in the 1998 removal proceedings, DHS was precluded from relitigating the issue of his alienage in the 2009 removal proceedings. Johnson further claims that the 1998 immigration judge declared him a citizen and that that ruling forever bars DHS from revisiting the issue of his citizenship or alienage.[2] But this is simply not the case. Johnson has not satisfied the requirements for issue preclusion, and, even if he could overcome that obstacle, preclusion still would not apply given the criminal misconduct apparent in his case.

A.

We begin our analysis with an overview of administrative preclusion principles. A "basic tenet of administrative law [is] that agencies should be free to fashion their own rules of procedure." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council, Inc.*, 435 U.S. 519, 544 (1978). Congress determined that "administrative agencies . . . will be in a better position than federal courts . . . to design procedural rules adapted to the peculiarities of the . . . tasks of the agency involved." *Id.* at 524-25 (quoting *FCC v. Schreiber*, 381 U.S. 279, 290 (1965)). Therefore, the judiciary should not reconstruct agency procedures unless they are inconsistent with the

that Congress and DHS were constitutionally compelled to devalue the importance of traditional family ties in immigration policy. This would frankly place us on the far limb, assigning to ourselves a choice that is in the end one for Congress to make.

[2]The legally relevant concept in removal proceedings is alienage, which is a state of not being a citizen. *See* 8 U.S.C. § 1101(a)(3). But the alienage inquiry is closely related to the citizenship inquiry because if Johnson were to establish the fact of citizenship, then DHS obviously could not establish the fact of his alienage.

demands of the agency's governing statute or the Constitution. *See Schreiber*, 381 U.S. at 290-91.

Accordingly, in the immigration context, we must take care to enforce only those preclusion principles consistent with the source of our authority—the Immigration and Nationality Act ("INA"). While judicial preclusion rules ordinarily reflect the common law, agency preclusion rules are creatures of statute. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991); *Duvall v. Attorney General of the United States*, 436 F.3d 382, 386-87 (3d Cir. 2006). Courts must thus refrain from imposing judge-made preclusion principles on agencies unless such a course is dictated by statute. *See Astoria*, 501 U.S. at 108; *Schreiber*, 381 U.S. at 290-91. The relative merits of the preclusion principles followed by courts and those followed by agencies are irrelevant: "[T]he question is not whether administrative estoppel is wise but whether it is intended by the legislature." *Astoria*, 501 U.S. at 108.

The INA contains no provision requiring the BIA to adopt any particular set of preclusion rules. Of course, it is true that "Congress is understood to legislate against a background of common-law adjudicatory principles," including rules of preclusion. *Id.* But this is not a license for courts to impose their own preclusion rules on agencies. To do so would undermine the agency's accumulated familiarity and expertise in its subject area. *See Schreiber*, 381 U.S. at 290-91. Agencies are familiar with their own procedures and rulings. *See id.* And an agency's expertise, developed over years of dealing with the subject matter delegated to it by the Congress, guides the agency in crafting appropriate rules of preclusion and assessing the preclusive effects of its prior rulings. *See id.* For a court to wade casually into the waters of agency procedure would not be conducive to the deference normally owed agencies in their congressionally sanctioned spheres.

Furthermore, federal courts traditionally refer to the preclusion rules of a fellow adjudicative body when determining the

preclusive effect of a ruling from that body. For example, when determining the preclusive effect of a state court ruling, federal courts do not view it through the lens of their own preclusion principles. Rather, they "give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged." *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466 (1982). Agency rulings present a similar case, especially in the context here, where the issue is the preclusive effect of a prior *agency* ruling on a later *agency* adjudication. Thus, it seems axiomatic that the BIA's rejection of the preclusive effect of its 1998 termination order is entitled to judicial respect.

## B.

Johnson claims that the government failed to prove his alienage in the 1998 proceedings by "clear, unequivocal, and convincing evidence." 8 C.F.R. § 1240.46. In fact, Johnson goes further, arguing that the 1998 immigration judge declared him a citizen. He contends, therefore, that the government is precluded from "relitigating" the issue of his alienage in later removal proceedings. To the extent that preclusion principles apply to removal proceedings, Johnson cannot benefit from them here. Johnson's first problem is that he cannot satisfy even the most basic principle of issue preclusion—that the issue actually had been decided in the previous proceeding. *Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 217 (4th Cir. 2006). No body of which we are aware would invoke preclusion against a party where the issue in question had never been previously decided.

The immigration judge in the 1998 proceedings never purported to declare Johnson a United States citizen. Rather, he merely noted that Johnson "appears to be [a] U.S. citizen by [his] father's [naturalization]." J.A. 31. As both the immigration judge and the BIA concluded, this equivocal language does not indicate any conferral of citizenship. The BIA stated

as much: "[T]he prior deportation case does not reflect a formal finding of citizenship." J.A. 262. A declaration of citizenship is a significant step, and it would be remarkable to find it accomplished in this offhanded a manner. In other words, assuming the privileges and obligations of citizenship is a matter of some formality, and it would undermine the naturalization process to hold otherwise.

Furthermore, neither immigration judges nor the BIA have any power to confer United States citizenship. We made this point explicit in *Barnes v. Holder*, 625 F.3d 801, 805-06 (4th Cir. 2010). There we noted that "the BIA and IJs . . . 'lack jurisdiction over [naturalization].'" *Id.* at 806 (quoting *In re Acosta Hidalgo*, 24 I. & N. Dec. 103, 108 (B.I.A. 2007)). "Congress has 'exclusive constitutional power' over nationalization, and therefore citizenship may be conferred upon foreign-born persons only by act of Congress." *Jahed v. Acri*, 468 F.3d 230, 234 (4th Cir. 2006) (quoting *INS v. Pangilinan*, 486 U.S. 875, 882 (1988)). Congress conferred "sole authority to naturalize persons as citizens of the United States . . . upon the Attorney General." 8 U.S.C. § 1421(a). The Attorney General delegated these powers to INS, and they have since been transferred to DHS. 6 U.S.C. §§ 271 & 557; 8 C.F.R. §§ 2.1 & 310.1. Although immigration judges, *see* 8 C.F.R. § 1003.10, and the BIA, *see* 8 C.F.R. § 1003.1, have responsibilities in the immigration area, naturalization is not among them. Thus, "DHS is the only body statutorily vested with the power to make naturalization decisions in the first instance." *Barnes*, 625 F.3d at 805. Accordingly, an application to DHS, and not a plea to an immigration judge, is the appropriate avenue to citizenship.

Johnson pursued this proper route to naturalization through INS. After the close of the 1998 proceedings, INS acted on Johnson's Form N-600 Application for Certificate of Citizenship; it denied his application. Thus, the official position of the agency with statutory and administrative authority over

naturalization issues is that Johnson is not a United States citizen.

The odd results of Johnson's position thus come into focus. If Johnson were to prevail on his preclusion argument, he would be left in limbo—in some nebulous state of quasi-citizenship or non-alienage. He could commit crimes without fear of deportation because in the context of removal proceedings he would be treated as a United States citizen. But, because he would not actually be a United States citizen, many of the other privileges of citizenship—such as voting or obtaining a United States passport—would remain beyond his grasp. Congress sought to avoid such a partial citizenship situation by centralizing naturalization authority. *See* 8 U.S.C. § 1421(a). We cannot upset this scheme by granting naturalization authority to the 1998 immigration judge who neither purported to nor had the power to declare Johnson a United States citizen.

## C.

Other bars to preclusion exist as well. No common law preclusion principle applies to an agency "when a statutory purpose [in opposition to the preclusion rule] is evident." *Astoria*, 501 U.S. at 108 (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)) (internal quotation marks omitted). Such a purpose is evident here. Removal of aliens who commit serious crimes is a central aim of the INA. *See Duvall*, 436 F.3d at 391. Congress not only has adopted streamlined procedures for deporting criminal aliens, *see* 8 U.S.C. § 1228(a) (requiring "special removal proceedings" that "assure[ ] expeditious removal" of criminal aliens), but it went even further, limiting judicial review of removal orders in such cases, *see* 8 U.S.C. § 1252(a)(2)(C) & (D) (restricting judicial review of final orders of removal against some criminal aliens to "constitutional claims or questions of law"). Legislative modifications of the INA have been in this same vein, seeking to craft a more effective and efficient process for

removing those aliens who commit serious crimes while in the United States. *See* REAL ID Act of 2005, Pub. L. No. 109-13, § 106; 119 Stat. 231, 310-11; Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, §§ 432, 440, 442, 110 Stat. 1214, 1273-74, 1276-80; Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 321, 110 Stat. 3009, 3009-627 to 3009-628.

Johnson falls into the class of criminal aliens Congress sought to remove. There are multiple statutory bases for removing Johnson because of his criminal misconduct. *See* 8 U.S.C. § 1227(a)(2). Just to name a few, his drug conviction qualifies him as removable under § 1227(a)(2)(B)(i), and his firearms convictions qualify him under § 1227(a)(2)(C). And yet he now seeks permanent immunization from removal, no matter what crimes he chooses to commit, all because of one ruling from an immigration judge in 1998 whose substance and legal import he has misconstrued.

Granting Johnson's request would trample on both agency practice and congressional intent. To preclude DHS from seeking to remove an alien who continues to engage in criminal conduct after the termination of earlier removal proceedings would frustrate one of the core purposes of the INA—the prompt removal of criminal aliens. *See Duvall*, 436 F.3d at 391. Indeed, only *repeat* offenders would benefit from such a rule of preclusion. As the Third Circuit noted, these aliens "could flout any rule or commit any offense without fear of deportation." *Id.* It would be ironic to suggest that Congress, in its repeated efforts to ensure the orderly removal of criminal aliens, had instead granted a uniquely generous rule of preclusion to a problematic class of repeat offenders. We simply cannot grant what Congress has refused to tender: the blanket immunization Johnson now seeks.

V.

For the foregoing reasons, we affirm the district court's dismissal of Johnson's petition for a writ of habeas corpus and deny his petition for review.

No. 09-1981 *AFFIRMED*
No. 10-1488 *PETITION DENIED*

GREGORY, Circuit Judge, dissenting:

While I agree that the rules of preclusion are, in this case, not applicable to the administrative courts, I believe that the Board of Immigration Appeals' interpretation of the phrase "legal separation" in 8 U.S.C. § 1432(a)(3) violates the equal protection guarantee of the Fifth Amendment's Due Process Clause. Therefore, I respectfully dissent.

The majority holds that a legal separation can occur only after a divorce, and, contrary to precedent, applies rational basis review to § 1432(a)(3). Section 1432(a)(3) is an immigration law that does not permit fathers to automatically pass on citizenship to their children born out-of-wedlock, and therefore discriminates based on legitimacy. Thus, I would instead apply heightened scrutiny, and save § 1432(a)(3) by reading it so that a separation may also occur where an alien mother has formally relinquished her rights over a child to a naturalized father. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). The adoption of this alternative interpretation would eliminate the unconstitutional aspects of the Board of Immigration Appeals' understanding of the law.

I.

As the majority correctly points out, Congress has plenary power in the immigration context, *see Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." (citation and internal quotations omitted)), and we are generally bound to apply only rational basis review when assessing an equal protection challenge to an immigration law, *Appiah v. I.N.S.*, 202 F.3d 704, 709-10 (4th Cir. 2000) (applying rational basis review where an alien questioned the constitutionality of an immigration law).

Nevertheless, where the petitioner, like Johnson, claims that he or she is statutorily entitled to actual citizenship, and is not merely seeking residency or a special immigration status, the Supreme Court has applied the more stringent form of "intermediate" or "heightened" scrutiny. *See Nguyen v. I.N.S.*, 533 U.S. 53, 60-61 (2001) (applying heightened scrutiny); *Miller v. Albright*, 523 U.S. 420, 429-34 & n.11 (1998) (plurality) (same); *see also Nguyen v. I.N.S.*, 208 F.3d 528, 533-35 (5th Cir. 2000), *aff'd* 533 U.S. 53 (2001) (same).

In *Miller*, the daughter of a citizen father brought an action challenging the constitutionality of 8 U.S.C. § 1409(a) on equal protection grounds. 523 U.S. at 426-27. Section 1409 required that, in order to pass citizenship onto his child born to an alien woman abroad, a citizen father had to recognize his child before she turned eighteen, but did not impose similar burdens on citizen mothers. *Id.* at 424-26.

After applying heightened scrutiny to the law, a plurality of the Court held that the statute did not violate equal protection. *Compare* 523 U.S. at 429-41 (plurality) *with* 523 U.S. at 476-78 (Breyer, J., dissenting) (arguing that intermediate scrutiny should apply to naturalization laws that discriminate based on sex). The plurality opinion distinguished *Fiallo* and declined to apply it "because that case involved the claims of several

aliens to a special immigration preference, whereas here peti-tioner claims that she is, and for years has been, an American citizen." *Miller*, 523 U.S. at 428-29; *see also Nguyen*, 208 F.3d at 535. In the present case, like the petitioner in *Miller*, Johnson also claims to have become and remained a citizen since 1973, when his father naturalized.

In *Nguyen*, a majority of the Supreme Court clarified *Miller* when it again upheld § 1409, but did so only after evaluating it under the heightened scrutiny standard. 533 U.S. at 60-61. The petitioner, a lawful permanent resident born out-of-wedlock to and raised by a citizen father in the United States, also claimed that 8 U.S.C. § 1409 violated equal protection, and that he was therefore entitled to actual citizenship. *Id.* at 58. Because the law at issue was a gender-based classifica-tion, the Court applied heightened scrutiny. *Id.* at 60-61. However, even after applying this standard, the Court again held that the law was valid because it was substantially related to the important governmental objectives of ensuring the exis-tence of a biological relationship and a genuine familial bond between the citizen father and the child. *Id.* at 60-71.

It does not matter that Johnson's challenge to § 1432(a)(3) is based on a distinction drawn between the marital status of his parents, and not explicitly on sex or gender discrimination, since both forms of classification are subjected to heightened scrutiny. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("[I]ntermediate scrutiny . . . has been applied to discrimina-tory classifications based on sex or illegitimacy."). We are further compelled to employ this higher standard because, like the statutes analyzed in *Miller* and *Nguyen*, § 1432 clearly implicates other significant constitutional interests, such as a person's rights to citizenship, *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963) ("Citizenship is a most precious right."), and to maintain a familial bond, *Wisconson v. Yoder*, 406 U.S. 205, 233-34 (1972) (describing the "charter of the

rights of parents" to direct the moral and religious upbringing of their children).**[1]**

## II.

"Intermediate scrutiny queries whether a statute is substantially related to an important governmental interest." *United States v. Chester*, 628 F.3d 673, 690 (4th Cir. 2010) (citing *Craig v. Boren*, 429 U.S. 190, 197 (1976)). "Significantly, intermediate scrutiny places the burden of establishing the required fit squarely upon the government." *Chester*, 628 F.3d at 683 (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480–81 (1989)).

Section 1432(a)(1) established a general rule that allows a child to obtain citizenship automatically only after both parents have naturalized. Recognizing the need for flexibility, Congress also created several exceptions to this rule which are outlined in §§ 1432(a)(2) and (a)(3), and include only those scenarios where "one parent has 'been removed from the picture' to some degree." Slip Op. 9 (quoting *Wedderburn v. I.N.S.*, 215 F.3d 795, 800 (7th Cir. 2000)). Specifically, these exceptions are situations where an unmarried mother has naturalized and the father has not legitimated the child, where one parent has died, and where the custodial parent has

---

[1]The cases relied on by the majority either mistakenly applied the lesser standard, *Barthelemy v. Ashcroft*, 329 F.3d 1062, 1065-66 (9th Cir. 2003), or did not involve equal protection challenges, *Lewis v. Gonzales*, 481 F.3d 125, 131-32 (2d Cir. 2007).

While the Seventh Circuit in *Wedderburn v. I.N.S.* did discuss *Miller*, that case was decided a year before *Nguyen*. 215 F.3d 795, 800-02 (7th Cir. 2000). The Seventh Circuit also wrongly found that the *Miller* plurality applied only the rational-basis test, 215 F.3d at 801, when in fact *Miller* undoubtedly applied heightened scrutiny, 523 U.S. at 434 n.11. *See also* 523 U.S. at 451-52 (O'Connor, J., concurring) (questioning the plurality opinion's decision to apply heightened scrutiny); *Nguyen*, 208 F.3d at 533-36 ("A plurality opinion authored by Justice Stevens, appl[ied] the heightened scrutiny standard . . . ." (citing *Miller*, 523 U.S. at 423)).

naturalized and there has been a "legal separation." 8 U.S.C. §§ 1432(a)(2) and (a)(3).

The majority reads § 1432(a)(2) so that it will only give automatic citizenship to a child when a father has retained custody of the child, divorced that child's alien mother, and then naturalized. My colleagues may be correct that, where an alien mother has an ongoing claim to a child, the protection of the mother's rights constitutes an important governmental interest. *See* Slip Op. 8-9; *see also Barthelemy v. Ashcroft*, 329 F.3d 1062, 1066 (9th Cir. 2003) ("If United States citizenship were conferred to a child where one parent naturalized, but the other parent remained an alien, the alien's parents rights could be effectively extinguished."). However, they too easily dismiss the legal limbo that this leaves children like Johnson in, i.e., persons whose parents were never-married, and whose alien mother has willingly absolved herself of all parental rights. Unlike the majority, I can see no governmental interest in or reasonable basis for protecting the illusory "rights" of such parents. How can the majority's interpretation comport with the Constitution when it clearly discriminates based on legitimacy, and does so ostensibly in order to "protect" rights that the rights-holder herself has abandoned? The answer is it cannot. Thus, it is unreasonable to seek to save § 1432(a)(3) by claiming that Congress "narrowly tailored" it so as to "avoid undue interference in the parent-child relationship" in circumstances like this one where the parent herself is not interested in maintaining such a relationship. Slip Op. 9.

Neither the majority, nor our sister Circuits have ever squarely addressed this obvious incongruence or this exact factual scenario. *See, e.g.*, *Barthelemy*, 329 F.3d at 1064 (petitioner's mother abandoned him at birth, but had never formally relinquished her rights); *Lewis v. Gonzales*, 481 F.3d 125, 126-27 (2d Cir. 2007) (petitioner immigrated to America with his father at age thirteen, and mother never surrendered her rights). In contrast to *Barthelemy* and *Lewis*, the issue of

legal parental abandonment is squarely before us in the form of undisputed documentation stating that, within a year of Johnson's birth, his mother ceded all of her parental rights over him to his father.

Our only solution to this dilemma is to read the statute so that it "raise[s] the rights of one parent," Johnson's naturalized father, "above those of the other," the absconding alien mother. Slip Op. 9; *see also Sandoval v. Reno*, 166 F.3d 225, 237 (3d Cir. 1999) (construing an immigration law to "avoid serious constitutional problems"). Johnson's father was the only parent ever to claim any legal interest in him after he was abandoned by his mother. His father then brought him to America, naturalized himself, and raised Johnson in this country. Under the alternative reading of § 1432(a)(3), Johnson would be allowed to show that he automatically became a citizen because his mother effectuated a "legal separation" when she gave up her parental rights. Because this separation did not end an official marriage, Johnson would not have to show that it was the result of a judicial proceeding as per *Afeta v. Gonzales*, 467 F.3d 402, 408 (4th Cir. 2006). Like the other exceptions to the general rule, this reading of § 1432(a)(3) would allow a child to be granted automatic citizenship only when one parent no longer has any legal interest in the child.[2]

I am also not convinced that § 1432(a)(3) is valid simply because 8 U.S.C. § 1433 also provides a means for an unwed, naturalized father to pass citizenship on to a child. Slip Op. at 10; *see also Lewis*, 481 F.3d at 132 (noting that § 1433 "imposes only modest requirements, none of which mandates a legal separation"). Because § 1433 does not provide for the *automatic* naturalization of children in Johnson's position, the framework lauded by the majority still unconstitutionally

---

[2]Indeed, it was probably because Johnson's father was under the impression that Johnson had gained American citizenship through his own naturalization that led him to take no additional steps to secure such citizenship for his son.

places more onerous burdens on the illegitimate children of a naturalized parent. Specifically, it puts these burdens on the children of unmarried fathers who, unlike those of unmarried mothers, are not covered by the second clause of § 1432(a)(3), which does allow a child to gain automatic citizenship upon the mother's naturalization. *Cf. Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-640 (1974) (recognizing that both parents have a fundamental constitutional "freedom of personal choice in matters of marriage and family life").

Accordingly, although Johnson does not raise this issue, it is evident that § 1432(a)(3) also permits sex discrimination. By raising more hurdles to the naturalization of the children of unmarried fathers than for those of the children of unmarried mothers, the law distinguishes these children based solely on the sex of their custodial parent. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 652 (1975) ("It is no less important for a child to be cared for by its sole . . . parent when that parent is male rather than female."). In *Nguyen* and *Miller*, § 1409 survived heightened scrutiny because it was based in part on actual biological differences between the sexes, and the need to create a father-child bond; whereas, here, Johnson's father continually claimed paternity of, supported, and maintained custody over Johnson. Since I would find a legal separation only in closely analogous situations, we would never be faced with the questions of paternity at issue in *Nguyen* and *Miller*.

The government has expressed no valid basis for raising additional barriers for the children of unmarried fathers. *See Mississippi University for Woman v. Hogan*, 458 U.S. 718, 724 (1982) ("[T]he party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an exceedingly persuasive justification for the classification." (citations and internal quotations omitted)). The law is unconstitutional because the government cannot even show that the discriminatory means employed in § 1432 for pursuing its stated pseudo-interest, i.e., protecting

the rights of the absconding alien mother, is sufficiently tailored to achieve its ends. *See Wengler v. Druggest Mut. Ins. Co.*, 446 U.S. 142, 150 (1980) ("[T]he discriminatory means employed must be substantially related to the achievement of [important governmental] objectives."). Congress could have made custody or support the relevant criterion for unmarried fathers, in the same way it did for unmarried mothers, widows, widowers, and divorcees in § 1432(a). Instead, Congress appears to have relied wholly on the invidious sex stereotype that an unmarried father has less of an interest than an unmarried mother in conferring citizenship to his child. *See Plyler v. Doe*, 457 U.S. 202, 213 (1982) ("The Equal Protection Clause was intended to work nothing less than the abolition of all caste-based and invidious class-based legislation."). Discriminatory laws should not be allowed to stand on such undoubtedly fragile foundations.

Indeed, given the government's failure to come up with any sincere basis, rational or otherwise, for the distinction it draws between legitimate and illegitimate children, as well as between unmarried fathers and unmarried mothers, I have serious doubts about whether § 1432 could withstand even rational basis review. *See City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446 (1985) (holding that, even under rational basis, a legislature "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

Finally, although the courts lack the power to confer citizenship, *I.N.S v. Pangilinan*, 486 U.S. 875, 884 (1988); 8 U.S.C. § 1421(a), we still must interpret the laws, even immigration laws, so that they do not offend the Constitution. *See Crowell v. Benson*, 285 U.S. 22, 62 (1932) (directing the courts generally to "ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided"); *Sandoval*, 166 F.3d at 237. Petitioner's interpretation would, in light of equal protection, transform § 1432(a)(3) into constitutionally acceptable legislation, and

provide for a statutorily sanctioned pathway for Johnson to obtain citizenship. That interpretation of the statute, rather than the Court itself, would then extend citizenship to Johnson. *Cf. Nguyen*, 533 U.S. at 71-72 (noting "that severance is based on the assumption that Congress would have intended the result," but declining to address this issue); *but see Miller*, 523 U.S. at 475 (Breyer, J., dissenting) (arguing that once an unconstitutional clause is excised from an immigration statute, it can operate to confer citizenship).

### III.

The government cannot show that the burden § 1432(a)(3) places on a naturalized parent's ability to automatically transmit citizenship to his or her child born out-of-wedlock is substantially related to an important government interest. *See Clark*, 486 U.S. at 461 ("[W]e have invalidated classifications that burden illegitimate children for the sake of punishing the illicit relations of their parents, because 'visiting this condemnation on the head of an infant is illogical and unjust.'" (quoting *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 175 (1972)). By limiting the definition of "legal separation" in § 1432(a)(3) to a divorce, the majority fails to remove these unconstitutional elements from the statute. I would read § 1432(a)(3) more flexibly so that, where an alien mother has abandoned her parental rights to a father, there has also been a legal separation. I would then find that Johnson automatically became a United States citizen upon the naturalization of his father. Only this reading would allow the statute to survive the heightened scrutiny review required by the Fifth Amendment and Supreme Court precedent.

For these reasons, I must dissent.