In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2241

Kevin Wedderburn,

Petitioner,

v.

Immigration and Naturalization Service,

Respondent.

Petition for Review of an Order of the
Board of Immigration Appeals

Argued January 5, 2000--Decided June 1, 2000

  Before Posner, Chief Judge, and Easterbrook and
Ripple, Circuit Judges.

  Easterbrook, Circuit Judge.  Children born outside
the United States, of alien parents, acquire U.S.
citizenship automatically if before their
eighteenth birthday they move to the United
States, and one or both of their parents become
U.S. citizens. Section 321(a) of the Immigration
and Nationality Act, 8 U.S.C. sec.1432(a). Kevin
Wedderburn, who was born in Jamaica of Jamaican
parents, contends that he became a citizen on
June 2, 1993, four months before his eighteenth
birthday, when his father Fitzroy Wedderburn
became a naturalized United States citizen.
Immigration officials, by contrast, believe that
Kevin is not a U.S. citizen because his mother,
Julie Hines, remains a citizen of Jamaica. Kevin
has been ordered deported because of his criminal
record (he was sentenced to six years'
imprisonment in 1995 for aggravated sexual
assault of a boy under nine years of age), and if
Kevin is an alien that criminal conviction not
only supports removal but also forecloses all
avenues of discretionary administrative relief
and judicial review. But a person ordered removed
is entitled to review of the questions whether he
is an alien, and whether he committed a felony
requiring removal. Yang v. INS, 109 F.3d 1185,
1192 (7th Cir. 1997). See also, e.g., Solorzano-
Patlan v. INS, 207 F.3d 869 (7th Cir. 2000);
Xiong v. INS, 173 F.3d 601 (7th Cir. 1999). Kevin
does not deny that his criminal conviction

requires removal, if he is an alien. (It is irrelevant for current purposes whether that conviction is best classified under 8 U.S.C. sec.1101(a)(43)(A), as "sexual abuse of a minor", or sec.1101(a)(43)(F), as a "a crime of violence . . . for which the term of imprisonment [is] at least one year".) Thus everything turns on citizenship: if Kevin is a citizen, the order of deportation must be set aside, but if he is not a citizen we must dismiss his petition for want of jurisdiction.

Kevin was born in Jamaica on October 30, 1975. His parents were not married and did not marry each other later--though on June 5, 1986, Fitzroy added his name to Kevin's birth certificate as the father, which under Jamaican law means that Kevin is a legitimate child. Before legitimating Kevin, Fitzroy moved to the United States and married. His wife, Velma, became a U.S. citizen in 1986 and filed a petition for a visa that would allow Kevin to live in the United States. When he was eleven, Kevin came to the United States, but after three years in New York with Fitzroy and Velma, he moved to Illinois to live with his paternal grandmother.

Whether these events made Kevin a citizen depends on sec.321(a), which reads:

A child born outside of the United States of alien parents . . . becomes a citizen of the United States upon fulfillment of the following conditions:

(1) The naturalization of both parents; or

(2) The naturalization of the surviving parent if one of the parents is deceased; or

(3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; and if

(4) Such naturalization takes place while such child is under the age of eighteen years; and

(5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

Kevin meets the conditions in clauses (4) and (5), so he is a citizen if any one of clauses (1) to (3) applies. Julie Hines has not naturalized, so he does not satisfy clause (1). Nothing in the record suggests that Julie has died, so Kevin does not satisfy clause (2). Clause (3) offers two options. Kevin does not satisfy the latter, involving his mother's naturalization, not only because Julie has not become a U.S. citizen but also because his paternity has been established by legitimation. He does not meet the former option, involving naturalization of the parent with legal custody, because his parents have not undergone "a legal separation" and it is unclear whether Fitzroy had "legal custody" of Kevin at the time. His residence at the time of Fitzroy's naturalization was with his paternal grandmother, so the BIA's conclusion that one parent's permanent physical custody with the other's consent is "legal custody" does not assist Kevin. See Matter of M--, 3 I.&N. Dec. 850 (1950). Kevin does not meet the requirements of sec.321(a).

Kevin asks us to read sec.321(a)(3) to treat him as a citizen notwithstanding his inability to meet the statutory conditions. His argument draws on what he believes is a statutory incongruity. Section 101(c)(1), 8 U.S.C. sec.1101(c)(1), which defines the term "child" for purposes of Title III of the Act (which comprises sec.321), includes legitimated and adopted children in the set eligible for citizenship.

The term "child" means an unmarried person under twenty-one years of age and includes a child legitimated under the law of the child's residence or domicile . . . if such legitimation or adoption takes place before the child reaches the age of 16 years . . ., and the child is in the legal custody of the legitimating or adopting parent or parents at the time of such legitimation or adoption.

According to Kevin, he is a "child" under this definition, so sec.321(a)(3) should be read to deem him a citizen. The premise of this argument is incorrect; he is not a "child" under sec.101(c)(1), because he was not in Fitzroy's custody at the time of the legitimating event. In June 1986, when Fitzroy legitimated Kevin by adding his name to Kevin's birth certificate, Fitzroy was living in New York, while Kevin was living in Jamaica with one of his grandmothers. But even if Kevin were a "child" under sec.101(c)(1), this would not by itself make him a citizen. Section 101 defines terms; the substantive requirements of citizenship appear elsewhere in the Act. Only with respect to sec.322, 8 U.S.C. sec.1433, which permits a U.S.

citizen parent to obtain citizenship for a "child" in his "legal custody," does the definition have independent significance. (Fitzroy has not sought to confer citizenship on Kevin via sec.322.) Both sec.101(c)(1) and sec.321(a) equate legitimated children to legitimate ones. Kevin's problem is not the nature of this equation, but the fact that he does not qualify under sec.321(a) whether he is "illegitimate," "legitimated," or "legitimate." The label does not make a difference, because Julie Hines is alive (we must assume) and has not become a U.S. citizen, and Kevin has never been in his father's "legal custody [after] there has been a legal separation of the parents". Putting sec.101 together with sec.321 does not help Kevin, and appealing to the statutes' spirit, as Kevin does, does not alter the statutes' language.

We may assume, as Kevin insists, that, when sec.321(a) was enacted, the predominant, if not the exclusive, means of legitimating an illegitimate child was the parents' subsequent marriage. When legitimation equals marriage, then a dissolution will produce "legal separation" and "legal custody", so that legitimated children can take full advantage of the first possibility under sec.321(a)(3). When some foreign nations made it possible to legitimate a child without marriage, or indeed abolished the distinction between legitimate and illegitimate children, this created the possibility that the legitimated child could not use sec.321(a)(3)'s first clause. Kevin sees this as a "gap" that we should close; but it is not a proper function of interpretation (as opposed to amendment) to ensure that every development in foreign law has a corresponding benefit under U.S. law. Kevin has the same options he and others like him possessed before Jamaica amended its law in 1976 to treat persons in his position as legitimate--Fitzroy's signature on the birth certificate did more to affect his status as a recognized father than to alter Kevin's status under Jamaican law--the amendment of Jamaican law does not have any significance for the proper interpretation of sec.321(a)(3).

At oral argument, the judges and counsel explored two different, and perhaps more promising, ways of approaching sec.321(a). One possibility is that "legal custody" and "legal separation of the parents" have a technical meaning, perhaps by incorporating Jamaican law, that enables Kevin to satisfy sec.321(a)(3). The other is that Congress acted irrationally, and thus unconstitutionally, by requiring both "legal custody" and "legal separation." The parties submitted post-argument memoranda concerning the

first of these possibilities. These memoranda show that Kevin did not raise either line of argument before the Board of Immigration Appeals, or for that matter in his appellate briefs, so they have been waived. But we cover them briefly nonetheless, if only to show that Kevin's deportation is not the result of a blunder by his lawyers.

"Legal custody" and "legal separation of the parents", as words in a federal statute, must take their meaning from federal law. On this both sides agree. But federal law may point to state (or foreign) law as a rule of decision, and this is how the INS has consistently understood these terms. Matter of H--, 3 I.&N. Dec. 742 (1949), concludes that the term "legal separation" means either a limited or absolute divorce obtained through judicial proceedings. It is thus apparent that the term "legal separation," can refer only to a situation where there has been a termination of the marital status. Since the subject's parents were not lawfully joined in wedlock, they could not have been legally separated.

3 I.&N. Dec. at 744. The last line of this quotation supposes, however, that Jamaican law limits "a limited or absolute divorce obtained through judicial proceedings" to situations in which a marriage is being dissolved. Because the INS determines the existence, validity, and dissolution of wedlock using the legal rules of the place where the marriage was performed (or dissolved), see DeSylva v. Ballantine, 351 U.S. 570, 580-82 (1956); Matter of Miraldo, 14 I.&N. Dec. 704 (1974); Matter of M--, it is at least possible that Jamaica permits unmarried persons to obtain a "legal separation" and an award of "legal custody" of the children. But Kevin's lawyers concede that, after a diligent search, they could not find any Jamaican law to that effect. They represent that marriage in Jamaica is a formal subject (Jamaica does not, for example, recognize common-law marriage) and that legal separation is limited to persons who have been married. In this respect, at least, Jamaican law tracks the expectation voiced in Matter of H--, so Kevin asks us to reject the whole approach of Matter of H-- and to treat not only the definition of the words in sec.321(a)(3), but also their referents, as matters of federal law. Many federal statutes now prescribe some rules of family law; for example, 1 U.S.C. sec.7 defines marriage, wherever that term appears in the United States Code, as "a legal union between one man and one woman as husband and wife". See Jill Elaine Hasday, Federalism and the Family Reconstructed, 45 U.C.L.A. L. Rev. 1297 (1998) (describing other national resolutions of family-law matters). Section 321(a) is just one more

example of the displacement of local law, Kevin insists.

That does not get Kevin very far if we understand "legal separation" normally. See Black's Law Dictionary 1369 (7th ed. 1999) (defining "separation" as "[a]n arrangement whereby a husband and wife live apart from each other while remaining married, either by mutual consent or by judicial decree; the act of carrying out such an arrangement.--Also termed legal separation; judicial separation."). Just as Matter of H-- says, domestic relations law in the United States treats "legal separation" as the judicial suspension or dissolution of a marriage. Kevin asks us to give it a completely different meaning, equating "legal separation" with "not being legally joined." Under this definition, Fitzroy Wedderburn and Julie Hines were "legally separated" from the moment they met (indeed, were "legally separated" before they met). Fitzroy would be "legally separated" from more than six billion people: everyone on the planet other than his wife. That is not a plausible interpretation of "legally separated", however, first because it leaves no work for "legally" (a word that in a construction like this usually refers to a judicial decree), and second because it is impossible to see how people who have never been joined can be separated. Separation implies a comparison to a former state of joinder. South America and Africa have been "separated" because they were once joined in Pangaea and Gondwanaland; but Hawaii, although separate from the continental United States, has never been "separated" from it. At all events, the BIA did not exceed its delegated powers when reading "legally separated" as drawing a distinction between cohabitation in marriage and a later state of living apart (with or without divorce); reading a phrase just as Black's Law Dictionary does can not be described as excessively freewheeling interpretation. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

What then of the possibility that sec.321(a)(3) is irrational because it requires proof of both "legal custody" and "legal separation"? Because the conjunction of "legal separation" with "legal custody" does not concern any suspect class, a rational basis is enough to defeat a constitutional challenge. It is not hard to think of a basis. Many legally separated parents share custody of their children. Congress did not have to treat divorce (or any other form of legal separation) as the equivalent of one parent's death; sec.321(a) as written means that in shared-custody cases both parents must naturalize, and this is entirely rational. As for

the reverse--legal custody in the naturalizing parent, but not legal separation of the parents-- this situation can come about when one parent has been deemed unfit to have custody, perhaps because of mental or medical conditions, or is physically unable to have custody (perhaps because of incarceration). Often these conditions will pass, and the parents will resume living together with joint custody of the child. Congress rationally could conclude that as long as the marriage continues the citizenship of the children should not change automatically with the citizenship of a single parent. After all, gaining U.S. citizenship by naturalization means disavowing one's original citizenship. 8 U.S.C. sec.1448(a)(2). (Usually disavowal means losing the original citizenship, though some foreign nations believe that citizenship acquired at birth cannot be lost, and hence treat naturalized U.S. citizens as dual nationals.) Both the child and the surviving but non-custodial parent may have reasons to prefer the child's original citizenship, which may affect obligations such as military service and taxation. Section 321(a) limits automatic changes to situations in which the other parent has been removed from the picture--either by death or by "legal separation." In a small subset of the cases in which there is legal custody it may prove impossible to meet the legal-separation requirement even in the long run--perhaps because a child was legitimated without marriage, perhaps because the nation with jurisdiction over the marriage does not recognize divorce or legal separation. See Matter of Miraldo. But for these cases sec.322 permits the custodial parent to obtain U.S. citizenship for his or her child as a matter of right, by filing an application. A law does not become unconstitutional just because it does not fit 100% of the cases; mismatches between legal rules and the world at large are inevitable. E.g., Califano v. Jobst, 434 U.S. 47 (1977). But sec.321(a) is a mismatch for a custody-but-not-legal-separation situation only when read independently of sec.322, which would be unsound.

  Although Kevin does not contend that sec.321(a)(3) is irrationally arbitrary, he has waged a vigorous constitutional challenge on other grounds. Relying on Miller v. Albright, 523 U.S. 420 (1998), he contends that sec.321(a)(3) violates the equal protection component of the fifth amendment's due process clause. According to Kevin, the statute "creates an invidious classification between naturalized mothers of illegitimate children, who can pass on the benefit of citizenship, and naturalized fathers of legitimated children, who cannot." Miller concerned the constitutionality of 8 U.S.C.

sec.1409, which provides that illegitimate children inherit the citizenship of their mothers, while fathers can transmit U.S. citizenship to offspring only if additional conditions are satisfied. Three groups of two Justices apiece made up the majority, and Lorelyn Miller, the person claiming citizenship through her father, lost in the end. But Kevin believes that we can patch different groups of Justices together to produce a majority for him:

Under the reasoning adopted by five Justices of the Supreme Court in Miller . . ., Kevin Wedderburn has third-party standing to challenge this gender-based classification. [See 523 U.S. at 431-33 (Stevens, J., joined by Rehnquist, C.J.), 473-74 (Breyer, J., joined by Souter & Ginsburg, JJ., dissenting).] Under the reasoning of another group of five Justices . . ., a gender-based distinction like the one in INA sec. 321(a)(3) is subject to heightened or intermediate scrutiny, which requires that the distinction be tailored to protect an important state interest. [See 523 U.S. at 451-52 (O'Connor, J., joined by Kennedy, J.), 476-81 (Breyer, J., joined by Souter & Ginsburg, JJ., dissenting).] Because the gender-based classification in INA sec. 321(a)(3) lacks any justification, the statute violates the parental right to equal protection under the Constitution.

Kevin's supposition that we can put together two concurring opinions with one dissenting opinion to produce a five-Justice majority on each contested issue overlooks the way the Justices counted votes in Miller itself. How votes should be aggregated on appellate courts is an interesting and debatable question. See Maxwell L. Stearns, Should Justices Ever Switch Votes?: Miller v. Albright in Social Choice Perspective, 7 Sup. Ct. Econ. Rev. 87 (1999). How votes were counted in Miller (and thus how an inferior court should predict that they will be counted in a similar future case) can be determined by inspection.

  Miller needed to win on each of three issues: standing, redressability, and the merits. She lost two votes on each, and thus lost a total of six votes and the case. Justices O'Connor and Kennedy believed that only the father has standing, for the right to pass citizenship to one's children belongs to the father and not the child. 523 U.S. at 445-51. "The statute . . . accords differential treatment to fathers and mothers, not to sons and daughters." Id. at 445. That is equally true of sec.321(a)(3). Justices Scalia and Thomas believed that even if the statute at issue in Miller were unconstitutional, no remedy would be available because "the Court

has no power to provide the relief requested: conferral of citizenship on a basis other than that prescribed by Congress." 523 U.S. at 453. That, too, is equally true of sec.321(a)(3). Finally, Chief Justice Rehnquist and Justice Stevens believed that the rational-basis test applies to statutes such as sec.1409, and that a distinction between citizen fathers and citizen mothers of illegitimate children is rationally related to legitimate governmental objectives. 523 U.S. at 433–45.

None of the six Justices who voted against Miller suggested that a constitutional challenge to sec.321(a)(3) would receive more favorable consideration, unless presented by the father. And the three dissenting Justices implied that a person in Kevin's position could lose even their votes. Justice Breyer explained that his view on standing was influenced by the fact that Lorelyn's father, Charlie Miller, tried to sue in his own name, only to have his suit dismissed for lack of standing. By obstructing Charlie's suit, Justice Breyer concluded, the Department of Justice enabled Lorelyn to litigate. 523 U.S. at 473–74 (Breyer, J., joined by Souter & Ginsburg, JJ., dissenting). Fitzroy Wedderburn, by contrast, has not sought to bestow citizenship on Kevin. Justice Breyer also thought it important to both redressability and the merits that Lorelyn claimed a right to citizenship at birth. He distinguished situations in which events after birth affect citizenship. Id. at 475, 481, 488–89. Kevin Wedderburn could not count on Justice Breyer's support.

We have been supposing so far that sec.321(a)(3) implements a form of sex discrimination. That would be so if Kevin were illegitimate. Then Julie Hines, but not Fitzroy Wedderburn, could make Kevin Wedderburn a U.S. citizen by naturalization. But Jamaica now deems Kevin legitimate, and sec.321(a) treats him the same way. The second option of sec.321(a)(3) drops out. Legitimated children become citizens if both parents naturalize, if the surviving parent naturalizes, or if the parent having "legal custody" naturalizes following the parents' "legal separation." Nothing depends on the sex of the parent (or parents) who naturalize or have custody.

To see this, suppose that Julie Hines had moved to the United States with Kevin, while Fitzroy Wedderburn had remained in Jamaica, and that Julie later naturalized. Julie's immigration and naturalization would not have affected Kevin's citizenship because the second option under sec.321(a)(3) does not apply to legitimated children. By equating legitimated and legitimate

children in both sec.101(c)(1) and sec.321(a), Congress avoided the kind of discrimination about which Kevin complains. An illegitimate child who has never been legitimated would have a claim (though in light of Miller it would not be a strong one); but a legitimated child such as Kevin has no sex-discrimination claim at all. Perhaps this explains the odd locution of Kevin's core argument, which we have already quoted: that sec.321(a)(3) "creates an invidious classification between naturalized mothers of illegitimate children, who can pass on the benefit of citizenship, and naturalized fathers of legitimated children, who cannot" (emphasis added). In this formulation, legitimation and not sex makes the difference. Anyway, the premise of Kevin's contention is untrue. A father of a legitimated child automatically passes citizenship to the child, if the mother also becomes a citizen, or has died, or if the father acquired "legal custody" of the child following a "legal separation" from the mother. A father also may pass citizenship to a legitimated child in his "legal custody" by applying for a certificate of citizenship under sec.322.

Kevin does not contend that Congress violated the Constitution by equating legitimated and legitimate children, and no such contention would be tenable. The second clause of sec.321(a)(3) does not discriminate against illegitimate children; instead it gives them an extra route to citizenship, one not enjoyed by legitimate (or legitimated) offspring. In the end, the nub of Kevin's argument must be that Fitzroy legitimated him on the cheap: by acknowledging his status as Kevin's parent rather than by marrying his mother, a step that (given Jamaican law) made the first option of sec.321(a)(3) unavailable to him. Fitzroy could have compensated by using sec.322, which permits a citizen who has a child in his "legal custody" to obtain citizenship for a child without regard to "legal separation" from the other parent--though this may not have been possible, since Kevin was not in Fitzroy's custody at the time of the legitimating event. Kevin himself, as a lawful permanent resident, could have applied for citizenship. But none of these things happened, and we have already explained why the Constitution does not require Congress to anticipate and accommodate every possibility created by foreign matrimonial law. Kevin is not a citizen of the United States, so his petition for review is DISMISSED.