**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
     *Plaintiff-Appellee,*

  v.

GUSTAVO ADOLFO SUCHITE
CASASOLA, AKA Casasola Suchite,
AKA Gustavo Suchite, AKA
Gustavo Adolfo Suchite,
     *Defendant-Appellant.*

No. 10-50376

D.C. No.
2:09-cr-00902-
RGK-1

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
September 2, 2011—Pasadena, California

Filed January 30, 2012

Before: Mary M. Schroeder and Ronald M. Gould,
Circuit Judges, and Michael Patrick McCuskey,
Chief District Judge.*

Opinion by Judge Schroeder

---

*The Honorable Michael Patrick McCuskey, Chief United States District Judge for the District of Central Illinois, sitting by designation.

## COUNSEL

David M. Herzog, Assistant United States Attorney, Los Angeles, California, for plaintiff-appellee United States of America.

Davina T. Chen, Department of Federal Public Defenders, Los Angeles, California, for defendant-appellant Gustavo Adolfo Suchite Casasola, etc.

## OPINION

SCHROEDER, Circuit Judge:

## I.  INTRODUCTION

Gustavo Adolfo Suchite Casasola ("Suchite"), a Guatemalan citizen, appeals his conviction and sentence for illegal re-

entry into the United States after removal, in violation of 8 U.S.C. § 1326. Suchite challenges the validity of his underlying removal, contending that he is a U.S. citizen. Suchite argues that he automatically derived U.S. citizenship upon his father's naturalization in 1997, when Suchite was fourteen. At that time, the controlling statute granted automatic derivative citizenship to foreign-born children of married parents only when both parents naturalized before the foreign-born child's eighteenth birthday. Suchite's mother, married to Suchite's father at all relevant times, did not naturalize until Suchite was twenty-one. The district court, therefore, correctly ruled Suchite was not a citizen. Our law in 1997 drew a distinction between foreign-born children whose parents were legally separated, and those, like Suchite, whose parents were married. *See* 8 U.S.C. § 1432(a). Had Suchite's parents been legally separated, or had the law now in effect been in effect before Suchite turned eighteen, then he would have automatically derived citizenship upon his father's naturalization. Suchite's principal argument on appeal is that the former statutory distinction between married and legally separated parents is irrational and hence a denial of equal protection. The government counters that the distinction has a rational basis in protecting the parental rights of a non-citizen, custodial parent. We have already recognized this to be a rational basis in *Barthelemy v. Ashcroft*, 329 F.3d 1062, 1066 (9th Cir. 2003). We accordingly enforce the statute as it is written and affirm the conviction because Suchite did not obtain derivative citizenship when his father alone was naturalized before Suchite turned eighteen.

Suchite further contends that the statute also denies equal protection in permitting automatic derivative citizenship when one parent having joint custody is naturalized, but not when one married parent is naturalized. We agree that result would be irrational, but follow the Fifth Circuit in holding the statute does not permit it. *See Bustamante-Barrera v. Gonzales*, 447 F.3d 388 (5th Cir. 2006). In order to confer automatic deriva-

tive citizenship in 1997, the custodial parent, upon naturalization, was required to have sole legal custody.

We also affirm the sentence. The Guideline amendment upon which Suchite relies is not retroactive. *See United States v. Urena*, 659 F.3d 903 (9th Cir. 2011).

## II.  FACTUAL AND STATUTORY BACKGROUND

### A.  Factual Background

Suchite was born in Guatemala on February 2, 1983 to Guatemalan parents. His parents were then and still are married. Suchite's father immigrated to the United States two years after Suchite's birth, and Suchite's mother followed one year later. Both of his parents found employment in the United States and were able to send money home to their children.

On July 17, 1995, when Suchite was twelve years old, he and his siblings were lawfully admitted into the United States on immigrant visas. On December 11, 1997, when Suchite was fourteen, his father became a naturalized U.S. citizen. Suchite turned eighteen on February 2, 2001. At that time, Suchite's mother was not yet a U.S. citizen.

In February 2003, a California court convicted Suchite of possessing methamphetamine for sale, in violation of California Health & Safety Code section 11378, and sentenced him to 36 months of probation and 180 days in county jail. While on probation in 2004, Suchite was convicted of receiving stolen property and sentenced to a two-year jail term. His probation for the 2003 methamphetamine conviction was revoked, and he was sentenced to two years in county jail, to be served concurrently with the sentence in his 2004 conviction. Because of his criminal activity, Suchite was removed from the United States on February 23, 2005 after his release

from custody. He soon returned to the United States and was removed again on May 18, 2005.

The events leading up to the present case occurred on July 25, 2009, when police arrested Suchite in California for using a controlled substance in violation of California Health & Safety Code section 1150(a). Suchite was transferred to the administrative custody of the U.S. Immigration and Customs Enforcement, and then prosecuted under § 1326, as an illegal alien found in the United States following removal.

Suchite filed a motion to dismiss the criminal information. He argued that § 1432(a), the statute which governed derivative citizenship before he turned eighteen, denied him his equal protection rights by discriminating against children of married parents. He argued that there was no rational basis for granting derivative citizenship to the foreign-born child of legally separated parents upon the naturalization of only one parent, but denying derivative citizenship to the foreign-born child of married parents in the same circumstances.

The district court denied Suchite's motion to dismiss, finding that there was a rational basis for Congress's decision to tie derivative citizenship to the naturalization of both parents if married and to the naturalization of the custodial parent if legally separated. Following the district court's denial, Suchite entered a conditional guilty plea, preserving his right to appeal the denial of his motion to dismiss.

At the sentencing hearing, the district court placed Suchite in criminal history category IV, with a sentencing guideline range of 57-71 months. The district court imposed a 57-month sentence. Suchite would have been in category III, with a sentencing guideline range of 46-57 months, but for the inclusion of two "recency" criminal history points under U.S.S.G. § 4A1.1(e). While his case was on direct appeal, the Sentencing Commission amended the Guidelines, deleting the "recency" points provision. U.S.S.G. Supp. Appx. C., Amend. 742

(effective Nov. 1, 2010) ("Amendment 742"). Suchite now asks us to remand to the district court for resentencing in light of Amendment 742.

## B.   Statutory Background

To answer the principal equal protection argument raised by Suchite in challenging his conviction, it is necessary to understand both the statutory scheme that governed automatic derivative citizenship before Suchite turned eighteen, and the statutory scheme that went into effect twenty-five days after Suchite's eighteenth birthday.

The law that controls this case was the law in effect before Suchite turned eighteen. *See Romero-Mendoza v. Holder*, ___ F.3d ___, No. 08-74674, 2011 WL 6318336, at *2 (9th Cir. Dec. 19, 2011) (quoting *Minasyan v. Gonzales*, 401 F.3d 1069, 1075 (9th Cir. 2005)). We accordingly look to the Immigration and Nationality Act ("INA") section 321(a), cod-ified at 8 U.S.C. § 1432(a), which was the governing law at that time. Section 1432 listed the specific conditions neces-sary for derivative citizenship. It provided in pertinent part:

> (a) A child born outside of the United States of alien parents . . . becomes a citizen of the United States upon fulfillment of the following conditions:
>
> > (1) The *naturalization of both parents*; or
> >
> > (2) The naturalization of the surviving par-ent if one of the parents is deceased; or
> >
> > (3) *The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents* or the naturalization of the mother if the child was born out of wedlock and the paternity

of the child has not been established by legitimation; and if

(4) Such naturalization takes place while such child is under the age of eighteen years; and

(5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

§ 1432(a) (emphasis added).

**[1]** We have recognized that when Congress passed § 1432(a), Congress "generally intended to provide automatic citizenship to children born abroad of alien parents only after the naturalization of *both* biological parents." *Barthelemy*, 329 F.3d at 1066. We identified the reason: Congress wanted to "prevent[ ] the naturalizing parent from usurping the parental rights of the alien parent." *Id.* To avoid having the general rule sweep too broadly, by encompassing situations in which there was no non-citizen parent with parental rights to protect, Congress allowed a foreign-born child to derive citizenship upon the naturalization of a single parent in the limited circumstance where the non-citizen parent was (1) deceased, (2) the non-custodial parent following a legal separation, or (3) an unknown father. § 1432(a)(2)-(3). *Id.*

In this case, Suchite does not satisfy § 1432(a)'s requirement that both his biological parents naturalize before his eighteenth birthday. The statutory exceptions do not apply because Suchite's non-citizen mother was alive, married to,

and not legally separated from, Suchite's naturalized-citizen father at all times before Suchite turned eighteen.

**[2]** The law changed less than a month after Suchite's eighteenth birthday. Suchite would have derived citizenship if he had turned eighteen after February 27, 2001, the effective date of the Child Citizenship Act ("CCA"). *See* 8 U.S.C. § 1431. The CCA repealed § 1432(a) and broadened the qualifications for derivative citizenship, allowing foreign-born children under the age of eighteen to derive U.S. citizenship automatically upon the naturalization of only one parent. *See id.* § 1431(a)(1).

The CCA now provides:

> (a) A child born outside the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled:
>
>> (1) *At least one parent of the child is a citizen of the United States, whether by birth or naturalization.*
>>
>> (2) The child is under the age of eighteen years.
>>
>> (3) The child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence.

*Id.* § 1431(a) (emphasis added).

The CCA demonstrates a material departure from the INA's former rule that both parents must naturalize to confer automatic derivative citizenship on a child. *Id.* Under the new law, if a foreign-born child is in the legal and physical custody of a parent who becomes a citizen, the foreign-born child

derives citizenship upon the naturalization of that parent. *Id.* This is now true even if the non-citizen parent retains parental rights. *See* 8 C.F.R. § 320.1(2).

The legislative history of the CCA indicates Congress wanted to simplify the naturalization process in order to help families. The House Report stated the Act would "benefit families with foreign-born children while untangling the complex and duplicative provisions of the [INA]." H.R. Rep. 106-852, at 4 (2000) (internal quotation marks and citation omitted). Of particular concern to legislators were the hurdles to citizenship faced by foreign-born, adopted children. *See Adopted Orphans Citizenship Act and Anti-Atrocity Alien Act: Hearing on H.R. 2883 and H.R. 3058 Before the Subcomm. on Immigr. and Claims of the H. Comm. on the Judiciary*, 106th Cong. 1-2 (2000) (opening statement of Lamar Smith, Chairman, H. Subcomm. on Immigr. and Claims) (hereinafter "Hearing"); *see also* H.R. Rep. No. 106-852, at 4. As a general matter, Congress wanted to ensure that foreign-born children were not deprived of U.S. citizenship simply because their parents did not know they needed to take additional steps to naturalize their children. H.R. Rep. No. 106-852, at *4; *see also* Hearing, at 2.

**[3]** This concern may be particularly apt in this case, where Suchite contends that his parents believed that his father's naturalization automatically conferred citizenship upon his children. Suchite's situation is sympathetic, and Congress subsequently acted to prevent its recurrence. The INA, however, and not the CCA, governs his claim of citizenship. Because the INA was based on a general policy that protected the parental rights of the custodial, non-citizen parent, in this case Suchite's mother, he cannot derive citizenship under § 1432(a) of the INA since only one of his custodial parents naturalized within the relevant time period.

We therefore turn to Suchite's contention that the statute is unconstitutional. Suchite challenges the provision on equal

protection grounds. He argues that § 1432(a) irrationally grants citizenship to children of legally separated parents upon the naturalization of only one parent with custodial rights, while denying citizenship to children of married parents in similar circumstances. The controlling equal protection issue is whether § 1432(a)'s distinction between foreign-born children of married parents and those of legally separated parents is rationally based.

## III.   ANALYSIS

### A.   Equal Protection

We decided a similar issue in *Barthelemy*, 329 F.3d at 1065. The petitioner in *Barthelemy* was born in Haiti to unmarried parents, neither of whom were U.S. citizens. *Id.* at 1063-64. Barthelemy never knew his mother because he was left in the care of his father and paternal grandparents soon after his birth. *Id.* at 1064. Barthelemy's father eventually immigrated to the United States and Barthelemy followed. *Id.* Barthelemy's father naturalized when Barthelemy was fourteen. *Id.* The same statutory scheme that controls here, controlled in *Barthelemy*. *Id.* at 1064 & n.l. Barthelemy, like Suchite, could not derive citizenship from his father because his father was not legally separated from his mother. *Id.* at 1064-65. He argued that § 1432(a) was unconstitutional because its legal separation requirement irrationally discriminated against foreign-born children whose parents were never married. *Id.* at 1065.

**[4]** We rejected this argument. *Id.* We held that the legal separation requirement was rational because it was consistent with § 1432(a)'s general statutory scheme to protect parental rights, including those of non-citizen parents. *Id.* at 1066; *see also Nehme v. INS*, 252 F.3d 415, 425 (5th Cir. 2001) (reasoning that Congress enacted the provision "to promote marital and family harmony and to prevent the child from being separated from an alien parent who has a legal right to custody");

*Johnson v. Whitehead*, 647 F.3d 120, 126 (4th Cir. 2011) (finding that Congress took great "pains to protect the rights of both parents"); *Wedderburn v. INS*, 215 F.3d 795, 800 (7th Cir. 2000) (reasoning that parents "may have reasons to prefer the child's original citizenship"); *Rodrigues v. Attorney General*, 321 Fed. Appx. 166, 169 (3d Cir. Apr. 14, 2009) (unpublished) (reasoning that the statute's purpose "was quite clear: it was structured to respect the rights of custodial parents who were not citizens of the United States"). We explained with a hypothetical situation in which an unmarried, but naturalized parent, unlawfully kidnaped the child from the non-citizen parent. *Barthelemy*, 329 F.3d at 1066. In this scenario, the requirement that the naturalized parent be the custodial, legally separated parent to confer derivative citizenship demonstrates a rational purpose. The requirement protects the rights of the non-citizen parent by preventing the naturalized parent from affecting the child's citizenship in violation of the interests of the non-citizen parent from whom the child was kidnaped. *Id.* at 1066-67.

**[5]** Although *Barthelemy* involved the protection of the parental rights of an unmarried parent, the principle of protecting parental rights is similarly served in the context of a marital relationship. Married couples do not always agree on how to raise their children, and not unfrequently live separately from each other, even though not legally separated or divorced. In this case, for instance, although neither divorced nor separated, Suchite's parents spent a year apart, with Suchite's father in the United States and his mother in Guatemala. If, hypothetically, Suchite's mother had stayed in Guatemala while Suchite was with his father in the United States when his father naturalized, there would be concerns about the rights of Suchite's non-citizen mother. The requirement that there be a legal separation to confer automatic derivative citizenship upon the father's naturalization could then more clearly be seen to protect the parental rights of Suchite's mother. With the benefit of hindsight, the requirement does not appear to serve the purpose of protecting the rights of the

non-citizen parent in this case, where the mother herself became a citizen not long after the father, but that does not make the statute irrational, only imperfect. *See Barthelemy*, 329 F.3d at 1067; *see also Wedderburn*, 215 F.3d at 800 (reasoning that "[a] law does not become unconstitutional just because it does not fit 100% of the cases").

Suchite makes a secondary equal protection argument. He contends we should interpret the phrase "legal custody" within the meaning of § 1432(a) to include a parent having joint legal custody, and then hold the statute is irrational by treating a citizen parent with joint legal custody differently from a parent who is married. If we were to construe the statute to grant derivative citizenship upon the naturalization of a parent with joint legal custody, we agree the result would be irrational. Our law, however, recognizes the principle that courts do not construe statutes in a manner that would lead to absurd results. *Ma v. Ashcroft*, 361 F.3d 553, 561 (9th Cir. 2004). Similarly, we do not impute to Congress an intent to create a law that produces an unreasonable result. *United States v. Kaldenberg*, 429 F.2d 161, 164 (9th Cir. 1970). The phrase "legal custody," therefore, means sole legal custody.

Suchite relies on a series of unpublished, non-precedential, BIA decisions in which the BIA said that derivative citizenship follows the naturalization of one parent with joint legal custody. *See In re Puertas*, No. A036-324-203, 2010 WL 4500862 (BIA Oct. 28, 2010) (unpublished); *In re Delcid*, No. A35-235-281, 2005 WL 1766776 (BIA May 3, 2005) (unpublished); *see also In re Applicant*, No. [redacted by agency], 2007 WL 5315191 (AAO Feb. 2, 2007). Only *Skidmore* deference, however, is owed to unpublished BIA decisions. *See Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1014 (9th Cir. 2006). Under *Skidmore* deference, we "examine the validity of the BIA's reasoning, its thoroughness, and overall persuasiveness," and give it weight accordingly. *Id.* at 1015.

**[6]** We must conclude that the non-precedential, BIA statutory interpretations are not worthy of any deference, because

they conflict with the words and obvious meaning of the statute. *See Simeonov v. Ashcroft*, 371 F.3d 532, 535 (9th Cir. 2004) (refusing to grant any deference when the agency decision was "contrary to the plain and sensible meaning of the statute" and would lead to an irrational result). Indeed, the only authority cited by the BIA from the time § 1432(a) was in effect is an unpublished 1996 Passport Bulletin issued by the State Department, an agency that does not enforce these immigration laws. The BIA's additional reliance on regulations later adopted by the Department of Homeland Security to implement the CCA is unpersuasive, because the CCA superseded the controlling statute in this case. Rather than follow unpublished, BIA decisions unworthy of deference, we instead give the statute a sensible interpretation and thereby agree with the only circuit decision that has addressed this issue, the Fifth Circuit's decision in *Bustamante-Barrera*, 447 F.3d at 395-96.

**[7]** In *Bustamante-Barrera*, the petitioner appealed his order of removal, arguing that he obtained automatic derivative citizenship when his mother naturalized while he was still a minor. *Id.* at 390-92. At the time his mother naturalized his parents were divorced, and although he lived exclusively with his mother, his parents had joint legal custody and his father retained visitation rights. *Id.* at 390-91. The Fifth Circuit expressly observed that construing the statute as satisfied by joint legal custody, what Suchite advocates here, would lead to the irrational and absurd.

> [I]nterpreting § 1432(a)(3) as amenable to being satisfied by a decree of joint legal custody would lead to an absurd result: (1) *not* recognizing derivative citizenship when an alien child's parents are *married* and only one parent is naturalized, while (2) *recognizing* derivative citizenship when an alien child's parents are *legally separated*, continue to share legal custody (and thus legal rights) over the child, and only one parent is naturalized. Inasmuch as, in each

example, *both* parents share rights over the child, we can conceive of no non-absurd reason—and Petitioner has furnished us none—why Congress would grant derivative citizenship to the child of the legally separated parents but not to the child of the married parents.

*Id.* at 398. The Fifth Circuit therefore held that "only sole legal custody" satisfied § 1432(a)'s requirement that the naturalizing parent have "legal custody." *Id.* at 396. We agree. Supporting the Fifth Circuit's decision were: (1) the statute's plain language within the overall statutory scheme of the INA; and (2) the statute's purpose of protecting parental rights. *Id.* at 396-98. We too find these compelling.

If Congress had intended the naturalization of one legally separated parent sharing joint legal custody to trigger § 1432(a)'s grant of derivative citizenship, then Congress could have easily provided that "the parent *or parents* having legal custody of the child" could confer derivative citizenship upon naturalization. *Id.* at 396 (internal quotation marks omitted). Congress has, in fact, used such language in other provisions of the INA. *See id.* at 396-97. In 8 U.S.C. § 1101(b)(1)(C) (emphasis added), Congress defines "child" as "a child legitimated under the law of the child's residence or domicile . . . if such legitimation takes place before the child reaches the age of eighteen years and the child is in the *legal custody* of the legitimating *parent or parents* at the time of such legitimation." *See also id.* § 1101(b)(1)(E)(I) (defining "child" to include an adopted child "if the child has been in the *legal custody* of, and resided with, the adopting *parent or parents*" (emphasis added)); *id.* § 1101(c)(1) (similarly requiring that the child be "in the *legal custody* of the legitimating or adopting *parent or parents*" (emphasis added)). As the Fifth Circuit summarized, "we are confident that, had Congress intended § 1432(a)(3) to be satisfied by either sole or joint legal custody, it would have used the same words or

at least very similar ones." *Bustamante-Barrera*, 447 F.3d at 397.

Furthermore, if § 1432(a) were interpreted to allow the naturalization of one parent with joint legal custody to confer automatic derivative citizenship on a child, the statute would not serve the purpose of protecting the custodial, non-citizen parent. *See id.* 397-98. Thus, in addition to the Fifth Circuit, a number of other circuit courts have assumed, if not explicitly decided, that "legal custody" is limited to "sole legal custody." *See Johnson*, 647 F.3d at 126 (explaining that automatic derivative citizenship applies when "one parent is awarded *sole custody* of the child" (emphasis added)); *Wedderburn*, 215 F.3d at 800 (postulating that § 1432(a) "as written means that in shared-custody cases both parents must naturalize, and this is entirely rational"); *Rodrigues*, 321 Fed. Appx. at 170 (concluding that there was no derivative citizenship because the parent's informal separation resulted in joint custodial rights); *see also Perez v. United States*, 502 F. Supp. 2d 301, 303 n.5 (N.D.N.Y. 2006) (summarily concluding that the statute requires sole legal custody); *Fisher v. Mukasey*, No. 08-CV-812, 2008 WL 4693135, at *7 (E.D.N.Y. Oct. 22, 2008) (unpublished) (citing *Bustamante-Barrera* for the proposition that "legal custody" is limited to sole legal custody); *Mohammed v. United States*, No. 07-22306-CIV, 2007 WL 4557145, at *7 (S.D. Fla. Dec. 21, 2007) (unpublished) (adopting *Bustamante-Barrera*'s holding that "legal custody" is limited to sole legal custody).

Finally, and as a last resort, Suchite points to a different provision of the statute, 8 U.S.C. § 1433, that permits only one naturalized parent to petition for citizenship of a minor child. He argues that if § 1432(a) is intended to protect the non-citizen parent by making the naturalization of only one married parent insufficient to confer automatic derivative citizenship, then the INA's entire statutory scheme is irrational and inconsistent because under § 1433, one parent may peti-

tion for the child's citizenship and the other parent is not even given an opportunity to object.

The problem with this contention is that the two sections deal with different ways that foreign-born children may derive citizenship from their parents. Section 1433 allows one parent who has made a conscious decision to naturalize a child to file a petition to achieve that end. Section 1432(a), on the other hand, deals with derivative citizenship that flows automatically when its requirements are met, without the need for any conscious decision or petition. The two provisions are thus consistent: because citizenship does not flow automatically from the naturalization of only one parent, the naturalized parent must ask for a child's citizenship. *See Wedderburn*, 215 F.3d at 800 (reasoning that § 1433 is the complement to § 1432(a) because it permits the naturalized, "custodial parent to obtain U.S. citizenship for his or her child as a matter of right, by filing an application"); *To Revise and Codify the Nationality Laws of the United States: Hearing on H.R. 6127 Before the H. Comm. on Immigr. and Naturalization*, 76th Cong. 445 (1940) (stating that § 1433 permits a citizen parent to petition to naturalize his or her child if that "citizen parent is favorable to [his or her child's] acquisition of such status"). The statute does not grant a non-citizen parent any right to object, for the INA is no longer concerned with the interests of the non-citizen parent once the citizen parent makes a conscious decision to apply for the child's citizenship and meets § 1433's other rigorous requirements of legal residence.

### B.   Sentencing Amendment

Suchite also requests that we use our discretionary powers and remand for further sentencing proceedings in light of Amendment 742 to the Sentencing Guidelines, which deleted the criminal history "recency" points used to calculate Suchite's criminal history category.

The former Sentencing Guidelines, under which Suchite was sentenced, provided in pertinent part: "Add 2 points [to

calculate the criminal history category] if the defendant committed the instant offense less than two years after release from imprisonment on a sentence counted under (a) or (b) or while in imprisonment or escape status on such a sentence." U.S.S.G. § 4A1.1(e) (Historical Notes, 2010 Amendment 742). Because Suchite violated § 1326 by illegally reentering the United States after removal, within two years of being discharged from parole, the district court properly added two points under then-applicable § 4A1.1(e).

**[8]** Amendment 742, which deleted the recency points provision, went into effect on November 1, 2010, three months after Suchite was sentenced and while he was pursuing this appeal. U.S.S.G. Supp. Appx. C., Amend. 742. The Sentencing Commission enacted the Amendment because it determined that the recency of the offense did not necessarily reflect an increased risk of recidivism or increased culpability. *Id.* The Commission did not give Amendment 742 retroactive effect. *See* U.S. Sentn'g Comm'n Public Meeting Minutes (Sept. 16, 2010) (explicitly choosing not to make the Amendment retroactive); *see also United States v. Diaz-Cardenas*, 351 F.3d 404, 409 (9th Cir. 2003) (holding that substantive amendments to the Guidelines have "no retroactive effect unless specifically referenced in U.S.S.G. § 1B1.10"); U.S.S.G. § 1B1.10 (no reference to Amendment 742).

Under Amendment 742, Suchite's criminal history category would have been III rather than IV, and his sentencing guideline range would have been 46-57 months instead of 57-71 months. Suchite relies on two First Circuit decisions to support his remand request: *United States v. Godin*, 522 F.3d 133, 135-36 (1st Cir. 2008) (per curiam) (remanding sentence to give the district court a chance to reconsider the sentence and decide "whether the original or some different sentence should be imposed and to determine what additional proceedings, if any, the judge might find helpful"); and *United States v. Ahrendt*, 560 F.3d 69, 79-80 (1st Cir. 2009) (same).

**[9]** We recently declined to follow the First Circuit in a similar case, however. *See Urena*, 659 F.3d at 910 (declining to adopt the approach in *Godin* where the sentence was substantively reasonable and procedurally correct). Like *Urena*, the sentence in this case is neither substantively nor procedurally unreasonable, and Suchite does not contend it is. Our decision in *Urena* requires us to affirm Suchite's sentence.

**AFFIRMED**.