# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 2, 2012

No. 11-60131

Lyle W. Cayce
Clerk

PATRICK MARC AYTON,

Petitioner

v.

ERIC H. HOLDER, JR., United States Attorney General,

Respondent

Petition for Review of an Order of the
Board of Immigration Appeals

Before KING, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:

The petitioner, Patrick Marc Ayton ("Ayton"), appeals the United States Board of Immigration Appeals' ("BIA") dismissal of Ayton's appeal of the Immigration Judge's ("IJ") order of removal. Ayton argues that he is entitled to derivative citizenship, pursuant to § 321(a) of the former Immigration and Nationality Act, Pub. L. 82-414, 66 Stat. 163 (1952) ("INA").[1] He also argues that

---

[1] Section 321(a), codified at 8 U.S.C. § 1432(a) (2000), was repealed by the Child Citizenship Act of 2000 § 103, Pub. L. 106-395, 114 Stat. 1631. The former version of 8 U.S.C. § 1432 was in effect at all times relevant to Ayton's citizenship claim, and is cited herein as § 321.

No. 11-60131

§ 321(a) unconstitutionally discriminated on the basis of gender and legitimacy.[2] We affirm the BIA decision.

## I. FACTS AND PROCEEDINGS

Ayton was born in the Bahamas on April 12, 1971, to Linval Henriques Ayton ("Linval") and Maudeline McDonald. Both parents were listed on his birth certificate, but they were not married and did not marry at any time subsequently. In 1972, Linval married a United States citizen and entered the United States as a lawful permanent resident. He divorced in 1977, and subsequently naturalized on December 8, 1978. Ayton's mother also married and divorced, retaining her married name, Maudeline McDonald Ford ("Ford"). Ayton and Ford both entered the United States as lawful permanent residents on March 30, 1983, when Ayton was eleven years old. Ayton moved in with Linval, and soon thereafter Linval and Ford began to cohabitate. They had six children together, including Ayton.

In 1985, Ford suffered cerebral anoxia—a deficiency in the flow of oxygen to the brain—during a caesarean section surgery and entered a persistent vegetative state. On April 3, 1987, a physician reported that her condition was unchanged, that she had "cerebral anoxia, brain death, vegetative state," and that she was "very unlikely" to recover. On August 23, 1985, the Circuit Court for Broward County, Florida adjudged Ford to be incompetent and appointed Linval as the guardian of her person and property. On July 16, 1987, the same

---

[2] Ayton also argues on appeal that he is entitled to relief under *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010), because he alleges that at no time during his criminal proceedings did his lawyer or the government tell him that he might be deported. The IJ correctly informed Ayton that a *Padilla v. Kentucky* claim of ineffective assistance of counsel may only be raised in a postconviction proceeding and not in an appeal against an order of removal.

No. 11-60131

court ordered $2,000 per month—$ 400 per month for each of Ford's minor children—be paid to Linval from Ford's guardianship depository for the benefit of her "dependent minor children." Ayton and his minor siblings continued to live with Linval during this time. Ford remained in a persistent vegetative state until her natural death on November 21, 1991, when Ayton was twenty years old. Ford did not naturalize before her death.

In 2005, Ayton pled guilty to the charge of conspiring to possess cocaine with intent to distribute. He was sentenced to sixty-five months of incarceration. He was not informed that his conviction made him eligible for deportation. In 2008, Ayton was served with notice to appear for removal proceedings. On September 23, 2009, the IJ conducted a hearing, during which Ayton asserted derivative citizenship pursuant to INA § 321. The IJ ordered Ayton's removal. Because there was no complete transcript of the proceedings, the BIA remanded the case back to the IJ, who conducted a second hearing and again ordered Ayton's removal. On appeal to the BIA, Ayton again claimed derivative citizenship under INA § 321. He argued that his father had naturalized while he was still a minor and (1) that his mother suffered brain death while he was still a minor; or, alternatively (2) that his father had legal custody of him. The BIA concluded that Ayton's mother was in a persistent vegetative state, not brain dead, and that his parents never legally separated, and denied his appeal. Ayton now appeals to this court, asserting the same claims to derivative citizenship.

## II. DISCUSSION

### A.

When a petitioner asserts a claim of citizenship but was not born in the United States, he bears "the burden of proving that he qualifies for

No. 11-60131

naturalization." *Marquez-Marquez v. Gonzales*, 455 F.3d 548, 554 (5th Cir. 2006) (internal quotation marks omitted) (quoting *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 394-95 (5th Cir. 2006)). Ayton must prove citizenship by a preponderance of credible evidence. *See Matter of Rodriquez-Tejedor*, 23 I&N Dec. 153, 164 (BIA 2001). In reviewing an appeal from an IJ order, the BIA and this court must "resolve all doubts 'in favor of the United States and against' those seeking citizenship." *Bustamante-Barrera*, 447 F.3d at 394-95 (quoting *Berenyi v. I.N.S.*, 385 U.S. 630, 637 (1967)). We review BIA rulings of law *de novo. Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 444 (5th Cir. 2001). We need not resolve here whether the BIA's interpretation of INA § 321(a)  is entitled to *Chevron* deference because our conclusion in this case would be the same whether we interpret the statute *de novo* or apply *Chevron* deference. *See Bustamante-Barrera*, 447 F.3d at 394.

**B.**

Section 321(a) granted automatic derivative citizenship to minor children born outside of the United States where: (1) both parents naturalized; (2) one parent naturalized and the other was deceased; or (3) the parent with legal custody naturalized where the parents were legally separated, or the mother naturalized where the child was born out of wedlock and paternity had not been established by legitimation; and if (4) the naturalization took place when the child was under the age of eighteen years; and (5) the child lawfully resided in the United States as a permanent resident either when the parent naturalized or else thereafter began to reside permanently in the United States while under

No. 11-60131

the age of eighteen years. § 321(a).[3] Because his mother never naturalized, Ayton needed to prove by a preponderance of credible evidence that he satisfied § 321(a)(2) or (3) in order to claim derivative citizenship.[4]

Ayton did not prove that his mother was deceased while he was still a minor and therefore did not satisfy § 321(a)(2). As the BIA explained, in 1952, when the INA was passed, the definition of death did not include brain death. Furthermore, the BIA correctly concluded that Ayton failed to prove that his mother was brain dead according to the contemporary definition of death, which came into prominence in the early 1980s. The contemporary definition of death differentiates between brain death and a persistent vegetative state. *See NINDS Coma Information Page*, Nat'l Inst. of Neurological Disorders & Stroke, Nat'l Insts. of Health, http://www.ninds.nih.gov/disorders/coma/coma.htm. According to the definition of death recommended by the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavior Research ("President's Commission") and endorsed by the American Bar Association, the American Medical Association, and the National Conference of Commissioners on Uniform State Laws, legal death includes "irreversible cessation of all functions of the entire brain, including the brain stem." President's Commission, *Defining Death: Medical, Legal, and Ethical Issues in the Determination of Death* 2 (1981). In Florida, where Ford suffered her brain injury, the statutory definition of death similarly requires "irreversible cessation of the functioning

---

[3] Section 321 was amended in 1978 to raise the age by which all the conditions had to be met from sixteen years to eighteen years. P.L. 95-417, 92 Stat. 917 (1978).

[4] Neither party disputes that, because Ayton was seven years old when his father naturalized and eleven years old when he entered the United States as a permanent resident, he would be able to satisfy the conditions of § 321(a)(4)-(5).

No. 11-60131

of the entire brain, including the brain stem." Fla. Stat. § 382.009(1). Individuals in a persistent vegetative state, or a coma, are not brain dead and retain lower brain functions. *NINDS Coma Information Page*, supra.

Ayton did not provide credible evidence that his mother was brain dead rather than in a persistent vegetative state. Ford's medical records and the Broward County adjudication of incompetency used both "brain dead" and "vegetative state" or "coma" to describe her state, but neither description provides details that would clarify whether she met the legal and medical definition of brain death. Moreover, the fact that Ford survived for six years after she suffered her brain injury suggests that she was in a persistent vegetative state, but not brain dead. Even with the help of a ventilator and "intensive medical management," an adult who suffers loss of all brain and brain stem functioning can survive only a short period of time, usually 2-10 days, before her heart stops beating. President's Commission, *supra*, at 17. A patient in a persistent vegetative state, whose brainstem continues to function, can survive for months or years, *id.* at 18, as Ford did. Because there is very little evidence in the record regarding Ford's brain functioning and what little there is supports the conclusion that she was in a persistent vegetative state rather than brain dead, we must conclude that Ayton failed to carry his burden of proving that his mother was deceased.[5]

---

[5] Ayton argues on appeal that the BIA erred in not considering the report of his mother's treating neurologist, Dr. Dickens. However, this report was not likely to support Ayton's position. According to Ayton, Dr. Dickens' report concluded that while Ford was in a coma, "there [was] no evidence of higher brain function," that "there [was] no hope for further improvement of her human brain function," and that "[i]t [was] expected that she [would] remain in this vegetative state indefinitely until some intervening medical illness would cause her demise." The language suggests that Ford had some lower brain functioning and that Dr. Dickens considered her to be alive, though in a coma. This language suggests that Ford was

No. 11-60131

Ayton also failed to satisfy § 321(a)(3). Because he claims derivative citizenship through his father, he must show that his father had legal custody of him and that his parents had legally separated. "Naturalization is available 'only as provided by Acts of Congress' and, even then, only 'in strict compliance with the terms of' such acts." *Bustamante-Barrera*, 447 F.3d at 394 (quoting *I.N.S. v. Pangilinan*, 486 U.S. 875, 884 (1988)). The language of § 321(a)(3) is clear and unambiguous. It requires *legal* separation and *legal* custody. We have held that "in the United States, the term 'legal separation' is uniformly understood to mean *judicial* separation." *Nehme v. I.N.S.*, 252 F.3d 415, 426 (5th Cir. 2001) (citing *Wedderburn v. I.N.S.*, 215 F.3d 795, 799 (7th Cir. 2000)). The children of parents who did not or were unable to obtain a judicial separation cannot claim derivative citizenship under that clause of § 321(a)(3). *See Nehme*, 252 F.3d at 419-20, 426; *see also Lewis v. Gonzales*, 481 F.3d 125, 130 (2d Cir. 2007) ("[T]he first clause of [§ 321(a)(3)] requires a legal separation even if the child's parents never married."). Ayton's parents never married and never obtained a legal separation. That Linval became Ford's guardian after her accident is irrelevant; guardianship did not create and was not equivalent to legal separation. Because Ayton's parents never legally separated, he cannot claim derivative citizenship pursuant to § 321(a)(3).

Ayton relies on dicta from the Seventh Circuit and Second Circuit to argue that he should derive citizenship from his father because his mother's medical condition effectively "removed [her] from the picture." *Wedderburn*, 215 F.3d at 800 (explaining that "[s]ection 321(a) limits automatic changes to situations in which the other parent has been removed from the picture—either by death or

---

in a persistent vegetative state, not brain dead.

No. 11-60131

by 'legal separation'"); *see also Lewis*, 481 F.3d at 131 (noting that the § 321(a) exceptions for derivative citizenship where only one parent has naturalized apply only where "the alien parent has been removed, or removed themself, from the child's life to some significant degree, such that their parental rights receive less respect"). However, this dicta merely provided an explanation as to why the government provided for derivative citizenship in some limited circumstances. It could not, and did not, authorize derivative citizenship in circumstances not identified in the statute. *See United States v. Smith*, 499 U.S. 160, 167 (1991) ("'Where Congress explicitly enumerates certain exceptions . . . additional exceptions are not to be implied, in the absence of contrary legislative intent.'" (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980)). Ayton does not qualify for derivative citizenship under any of the circumstances that Congress enumerated in § 321(a), and we cannot now add to the statute an exception for the circumstance that presented itself in this case.

## C.

Ayton also contends that § 321(a) violated his equal protection rights because it discriminates on the basis of legitimacy and gender. Ayton's gender-based equal protection claim rests on the argument that the statute permitted unconstitutional gender-based classification by allowing naturalized mothers to confer their citizenship on their children born out of wedlock, but not allowing naturalized fathers to similarly confer their citizenship on their children born out of wedlock. Ayton's legitimacy-based equal protection claim is based on the contention that the statute impermissibly discriminated against the legitimated children of naturalized mothers.

No. 11-60131

Because this is a constitutional claim, this court is not precluded from reviewing it even though Ayton failed to raise it before the BIA. *See* 8 U.S.C. § 1252(a)(2)(D).[6] However, Ayton's claim does not implicate equal protection. *See, e.g.*, *Marquez-Morales v. Holder*, 377 F. Appx. 361, 365 (5th Cir. 2010) (unpublished). Because Ayton's father established Ayton's paternity, Ayton's mother also would not have been able to confer citizenship on Ayton. As a result, Ayton's mother did not have a gender-based advantage pursuant to § 321(a)(3), and his father was not disadvantaged because of his gender. Ayton's derivative citizenship claim therefore did not implicate gender-based equal protection principles. In addition, because Ford never naturalized, Ayton could not have claimed derivative citizenship through her, even if Linval had not established paternity. Because Ayton's legitimacy did not deprive him of derivative citizenship, his citizenship claim did not implicate equal protection on the basis of legitimacy.

Furthermore, Ayton's equal protection claims fail on the merits. First, § 321(a)(3) survives the heightened scrutiny that governs gender discrimination claims. It is analogous to a similar immigration statute that survived a gender-based equal protection claim in *Nguyen v. I.N.S.*, 533 U.S. 53 (2001). In *Nguyen*, the Supreme Court concluded that an immigration statute that conferred citizenship on a child born outside of the United States to unmarried parents only if the mother was a U.S. citizen survived heightened scrutiny. The Court explained that the differential treatment between unmarried mothers and

---

[6] Section 1252(a)(2)(D) is an exception to § 8 U.S.C. 1252(d), which bars this court from reviewing any claim that an alien petitioner failed to raise before the BIA and therefore failed to exhaust. 8 U.S.C. § 1252(a)(2)(D); *see also Omari v. Holder*, 562 F.3d 314, 318-19 (5th Cir. 2009).

unmarried fathers "serve[d] important governmental objectives and . . . [was] substantially related to the achievement of those objectives." *Id.* at 61 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)) (internal quotation marks omitted). The Supreme Court explained that this statute serves the important government interests of "assuring that a biological parent-child relationship exists," and "ensuring that such an opportunity, inherent in the event of birth as to the mother-child relationship, exists between father and child before citizenship is conferred upon the latter." *Id.* at 62, 66. Section 321(a) serves the same important government interest of "assuring that a biological parent-child relationship exists" before citizenship is conferred on the child of a U.S. citizen. *Id.* at 62.

Ayton's claim of legitimacy-based discrimination also fails. Because this claim "does not concern any suspect class, a rational basis is enough to defeat a constitutional challenge." *Wedderburn*, 215 F.3d at 800. Under rational basis review, the challenged statute will be upheld "'so long as it bears a rational relation to *some* legitimate end.'" *LeClerc v. Webb*, 419 F.3d 405, 421 (5th Cir. 2005) (quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997)). As several circuits have concluded, differential treatment based on legitimacy rationally serves the legitimate "purpose of protecting parental rights." *Bustamante-Barrera*, 447 F.3d at 398; *see also Barthelemy v. Ashcroft*, 329 F.3d 1062, 1066-67 (9th Cir. 2003). Section 321(a) automatically changes a child's citizenship, and the government has a legitimate interest in "limit[ing] automatic changes [in citizenship] to situations in which the other parent has been *removed from the picture*—either by death or by legal separation." *Bustamante-Barrera*, 447 F.3d at 398 (alterations in original) (quoting *Wedderburn*, 215 F.3d at 800) (internal

No. 11-60131

quotation marks omitted). Though "Congress [might] have carved out an additional route to citizenship" for petitioners like Ayton, the statute need not be "perfect." *Barthelemy*, 329 F.3d at 1067.[7] It is relevant only that the statute as drafted passes rational basis review. *Id.* Because the government has a rational basis for differentiating between legitimated and non-legitimated children for the purposes of conferring derivative citizenship, § 321(a)(3) survives Ayton's equal protection challenge.

## III. CONCLUSION

For the above reasons, the BIA decision is AFFIRMED.

---

[7] Moreover, Congress did carve out a route to citizenship for petitioners like Ayton, who were not covered by § 321. INA § 322 governed the naturalization of children who had only one naturalized parent, by providing for citizenship on the petition of such parent as long as the child was not otherwise disqualified from becoming a citizen and was residing permanently in the United States. There is no evidence that Linval petitioned to naturalize Ayton pursuant to § 322.